H. W. HUTTIG, Appellant, v. JAMES M. BRENNAN.—41 S. W. (2d) 1054.

Division One, July 28, 1931.

*Hensley, Allen & Marsalek* and *Allen, Moser & Marsalek* for appellant.

*Charles A. Houts* for respondents.

476

HYDE, C.—This is a suit on two negotiable promissory notes. Appellant sued respondent and J. B. Miller thereon on November 14, 1925. The first count of appellant's petition declared on a note for $2,500 made by respondent and Miller to F. J. Quinby on December 29, 1924, due May 11, 1925, with interest at six per cent per annum·from date. The second count was on a note for $5,000, also made by respondent and Miller to Quinby, on December 29, 1924, due June 26, 1925, with the same provision for interest. It was alleged in each count that nothing had been paid on either the principal or interest, and that each note was, before maturity, for value endorsed and delivered to appellant, and that appellant was the rightful owner and holder thereof. Appellant prayed for judgment for the principal sum of each note with interest at six per cent per annum thereon from December 29, 1924. Before the trial, however, appellant dismissed as to Miller.

It appears from the record that these notes were executed by respondent under the following circumstances:

Quinby, who bore the military title of Major, arrived upon the scene of action, in St. Louis, about the first of October, 1924. The Major was a promoter of oil companies and Texas real estate. He had attorneys, confidential men, associates, maps, plats, and other essentials of a promoter. His activities, always in large projects, had reached from Texas to Long Island, New York. One of appellant's witnesses charitably described him as "extravagant in his ideas." It seems that the Francis Brothers of St. Louis, particularly Mr. S. R. Francis, had sunk many thousands of dollars in some of the Major's oil projects. It seems, also, that appellant had been a financial godfather to the Major, having backed him in his various projects since 1920, with the net result that the Major owed him a considerable amount of money, for which, it may be gathered, he had security which was not entirely satisfactory to him. Somewhere in the course of these tangled affairs, notes of S. R. Francis, for considerable amounts, came into the hands of appellant, who was in the commercial paper business, and were placed in various banks by him. It seems that Major Quinby was responsible for these.

On August 4, 1924, appellant wrote S. R. Francis that he could not find Major Quinby; that $32,000 was due at a bank which held as collateral the Persidio land (a tract of land in Texas in which the Major was interested), and "they also have his assignments all through of his interests, at the time the assignment was made on everything down at Fort Stockton, of everything he had;" that this note was due on the 25th and that the bank was going to sell the Persidio land and the assignments by that time; that "there will be a lawsuit unless we can get fixed up on this stuff;" and that it was very important that he meet Major Quinby within the next week and urged Francis to arrange this.

The record is silent as to whether or not they met. It does show that shortly after October 1st, Major Quinby became acquainted with respondent, who was at the time thirty-four years of age, and was connected with the grocery firm of his father, William J. Brennan, with whom he lived. Respondent, and his father also, had gone into the oil business in a small way in Kentucky, where they operated a company called the Cadillac Oil & Gas Company. They had drilled eight or ten shallow wells on a tract of 177 acres, and some of these wells were producing.

On October 20, 1924, respondent entered into a contract with Major Quinby, but, at this point, the parties violently differ as to what happened. According to respondent's evidence, he went on that date to the Major's hotel room where he found the Major and with him a friend, H. J. Walter, and after some glowing accounts by the Major concerning the Texas prospects, in which respondent would be allowed to participate, he pulled from his chiffonier drawer

a prepared contract which respondent then and there enthusiastically signed and Walter promptly witnessed. It seems that the Major was able to keep the enthusiasm of respondent aflame for a considerable period thereafter. According to the evidence of Judge Metcalf, on the part of appellant, he was present as Major Quinby's attorney and saw respondent sign the contract after it was first very carefully explained to him by the Judge, who had prepared it.

This contract recited that Major Quinby was the owner of some 3,000 lots in the city of Fort Stockton, in Pecos County, Texas, and that a definite and particular description of all these was fully set forth in a plat attached, marked "Exhibit A," and made a part of the contract. The contract further recited that the Major was desirous of making speedy disposition of 1,000 of the said lots for the price of $100 per lot. (No one seems to question the accuracy of this statement.) The contract further recited that respondent was desirous of contracting with the Major to provide him with the sum of $100,000 within the time and for the consideration stated. The contract then provided that Major Quinby agreed to sell and convey or cause to be conveyed, free and clear of encumbrances, with taxes paid up, including those of 1924, to respondent or to whomsoever he may direct, as paid for at not less than $100 per lot, 1,000 of the lots shown in "Exhibit A;" that the Major was to procure at least five salesmen to assist respondent in selling said lots on a commission basis of 20 per cent, to be paid out of Major Quinby's $100; that respondent might appoint other salesmen on the same basis; that respondent should be credited on the $100,000 for sales made by all of these salesmen, or to their prospects; and that the Major would also furnish and pay for, out of the $100,000 coming to him, such advertising matter as he might approve. The contract provided that respondent "agrees to provide first party (the Major) from the sale of lots in 'Exhibit A' described, *or otherwise*" (not italicized in the contract) "the total sum of $100,000, which was to be paid as follows: $20,000 in thirty days and $10,000 on the 20th day of each month thereafter.

The contract further provided that Major Quinby agreed to convey or cause to be conveyed to respondent or to whomsoever he might direct, free and clear of encumbrances and with taxes paid, including those of 1924, 700 lots situated in certain tracts of land being platted as an addition to the city of Fort Stockton, the tracts being fully described in a schedule attached, marked "Exhibit B," and made a part of the contract, with the option to respondent to have a like number of lots out of those in "Exhibit A" "which shall be similarly situated with respect to the location of the well to be drilled as shown on 'Exhibit A,' as are the lots shown in 'Exhibit B.'" The conveyance of these lots with complete abstract of title was to be

made to respondent when he had made the first payment of $20,000 provided for. The contract, then, again recited respondent's rights to choose the 700 lots from those shown in "Exhibit A," "similarly located with reference to the drilling site shown on 'Exhibit A,' as are the lots platted from 'Exhibit B.'" The contract then further provided that when respondent had fully complied with its terms the Major would have issued and delivered to him $50,000 par value of the capital stock of the Stockton Oil Company, a corporation which was to be organized in Delaware with two and one-half million dollars capital; would pay to respondent one-eighth of the net profits derived from the sale of leases sold for financing the Stockton Oil Company; would assign to respondent "oil and gas leases covering 20,000 acres of land;" and finally, that the $100,000 to be furnished the Major by respondent, less the salesmens' commissions and advertising, *"shall and will be used and expended toward the expense of commencing of the drilling of the well, location for which is shown on 'Exhibit A,' and for the benefit and best interests of the Stockton Oil Company,"* and further, to cause respondent to be elected director of said Stockton Oil Company.

For all of these munificent provisions for respondent, the contract required only (in addition to the $100,000) that respondent should cause to be conveyed to Major Quinby or whomsoever he may direct, the oil and gas leases and personal property of the Cadillac Oil & Gas Company, described in a schedule marked "Exhibit C," and made a part of the contract. Exhibits "A," "B" and "C" were not then or ever attached.

It appears from the record that thereafter, within a few days, deeds were made by parties, who held title to the same, to Judge Metcalf for numerous Fort Stockton lots, subject to a deed of trust securing the payment of some $26,000. It further appears that after a few more days, October 30, 1924, to be exact, appellant wrote another letter to Mr. Francis in which he complained that Major Quinby's shabby treatment had nearly ruined him financially; that Francis had not paid his notes in Omaha; that Quinby had committed several acts of bankruptcy and that "by throwing him into bankruptcy our interests will all be determined  .  .  .  will come to St. Louis  .  .  .  November 6, and start the ball rolling." He added, however, "I will not be a party to any criminal action against Quinby. I won't fight that way." The record is silent as to what, if anything, happened on November 6, but evidently, for some reason, appellant did not "start the ball rolling." It is in the record, however, that there was a meeting in December, with appellant, Major Quinby, and one of the Francis Brothers present. A contract was made which, to quote appellant's account of it, in a letter written to Mr. Francis on April 20, 1925, was as follows:

"Under that contract I loaned my $7,500, six months note, to Quinby, to be discounted with your brothers, to take care of the releases on some lots at Fort Stockton, which had to be paid. The contract was this, that I ·was to receive by the 31st of December $4,000 and by the 22nd of January another $2,000 and on the 22nd of each month thereafter another $2,000, in cash, which was to take up your notes. Besides this, out of the Brennan deal Quinby was to pay your brother my $7,500 note before it was due. This was all based upon the contract with Quinby that James H. Brennan had made, under which Brennan was to pay on the 20th of each month thereafter, until the $80,000 had been paid. You will remember I did not get any payment under this contract, but I did get $10,000 of Brennan notes and paid Mr. Quinby $5,000 cash. He allowed me $1,000 for carrying them and $4,000 was to apply on your notes due May 10, which were renewals, when the Brennan notes were paid."

It seems that up until this time Major Quinby had done little, if anything, toward marshalling his forces to sell the lots in St. Louis, but that about this time or soon thereafter, an office was opened under the name of "St. Louis and Southern Realty Company," in charge of a man by the name of Daniel. Through this office the people of St. Louis were permitted to buy these lots at $150 per lot. The evidence shows that the Major had paid as high as $15 for some of them. On December 29, 1924, Major Quinby procured Judge J. B. Miller to write what was called an extension contract between himself and respondent. This contract recited that the contract of October 20, 1924, had been executed; recited its terms as to payments and some other matters and stated that "owing to disappointing conditions, the said J. M. Brennan is unable to make the payments as is provided for in said original contract hereto attached and the said F. J. Quinby, being desirous of assisting the said J. M. Brennan in carrying out the terms and conditions of said original contract;" stated that respondent has executed three notes in the total sum of $10,000, as follows: $2,500, payable March 26, 1925; $2,500, payable May 11, 1925; $5,000, payable June 26, 1925, all bearing six per cent interest. The extension contract provided that the original contract should be credited with $10,000, and all payments under it extended to June 26, 1925; that if default was made in the payment of either of the notes the extension was to be null and void; that as funds were received from the sale of lots they should be applied, less commission and expenses, to the payment of the notes, and after they were paid, to the payments provided for in the original contract; and that the parties were to prepare the papers, for the transfer of the 700 additional lots for the Cadillac Oil Company holdings, so that the same could be closed without delay as soon as $20,000 had been paid. Respondent was somewhat hesi-

tant about signing these notes, but finally did so when Quinby's attorney, Judge Miller, was optomistic enough to sign them with him.

Respondent says that Major Quinby told him that he would not transfer these notes, but they soon passed from the Major to appellant. At this point, again, there is a violent disagreement as to what happened. According to appellant's evidence, he took the notes, without having ever seen either the original contract or the extension contract, and had no knowledge whatever that respondent expected them to be paid from any outside source. Judge Miller, however, who was with appellant and Major Quinby at the time, testified as follows:

"THE WITNESS: He (Quinby) said: 'I need some money, and if you can get Brennan to fix these notes, Mr. Huttig is supposed to be here in a few days and he will handle the notes. He will take the notes,' and he explained to me about his deal of Mr. Huttig, and so Mr. Huttig was to come, and Major Quinby called me, had me come to the hotel; he wanted to explain to Mr. Huttig about Mr. Brennan. I met Mr. Huttig in the lobby of the hotel and we talked a little bit and visited, and he told me, 'Do you know this man Brennan?' and I said, 'Yes,' and, 'Well,' he said, 'what do you think about him paying these notes?' and, 'Well,' I said, 'Mr. Huttig, I don't think Mr. Brennan would go into the contract if he didn't expect to carry it out, yet, you understand, there is some contingencies to that.'

"MR. HOUTS: Q. You understand what? A. Some contingencies to be performed as to the payment of these notes, and he had—he didn't open it; he didn't read it, but he had a paper folded in his hand and said, 'You prepared this extension contract and these notes, didn't you?' and I said, 'Yes,' and he said, 'Well, do you think it will be paid when due?' and I said, 'Well, now, Mr. Huttig, that depends; you understand that this all hinges on lot sales,' and he said 'Yes, I know; it has got to be gotten out, and you have got to work together and work in harmony, and it will likely work out all right; as you sell lots, Brennan will pay notes.' He asked a few more questions about Jim's standing, and I said, 'Financially, I don't know; I don't know what their arrangements are up there in the grocery concern; I don't know whether they are incorporated or what; he seems to be at the head of it, and in charge of it, as far as that is concerned; I don't know what he is worth, individually, but I don't think he would go into any contract he wouldn't carry out, but, I said, 'You understand about this other,' and he mentioned to me about the original contract; I don't know whether I had read the original contract at that time or not.''

Judge Miller, also, after this conversation, went, on January 17, 1925, to respondent and got him to write the following letter to Major Quinby, which the Major forwarded to or delivered to appellant:

"Dear Mr. Quinby: Replying to your letter of recent date relative to three notes, bearing date of December 29th, 1924, signed by J. B. Miller and myself, wish to say I expect these notes to be paid when due, these would not have been given if we did not expect them to be taken care of when due. Very truly yours, (Signed) Jas. M. Brennan."

It appears, however, that this letter did not satisfy appellant, for he thereafter wrote respondent as follows:

"Dear Mr. Brennan: As you know, Mr. Quinby turned over three notes you gave him, to me and I discounted them. I have them sold provided I can get the right kind of a letter from you. The letter you wrote Mr. Quinby under date of Jan. 17th the bank does not consider quite satisfactory, as you say in that letter that you expect these notes will be paid, and that you would not have given them if you had not expected them to be taken care of when due. Your letter rather sounds as if you expected somebody else to pay them. Will you kindly write me a letter stating that these notes were given in due course of business and that you will pay them when due. Then I can handle the notes without any trouble. Hoping to hear from you by return mail, I remain, Yours truly, (Signed) H. W. Huttig."

Respondent, however, did not write another letter.

The further development of affairs as shown by the testimony and letters from appellant to S. R. Francis and David R. Francis, Jr., during the period from January to June, 1925, seems to be about as follows:

Daniel, in the St. Louis office, was selling some lots, but results were far below the expectations of the parties. Appellant furnished $2500 on Daniel's note, secured by lot purchase contracts and notes, in the amount of about $14,000, but Daniel proceeded to spend all the money which he received, whether it was paid on these collateral notes or on new sales, including about $1,000 respondent advanced. Appellant and Major Quinby apparently deciding that the St. Louis field was too limited, for one of the Major's talents, moved the Major to Chicago and raised the price of lots to $200. According to one of appellant's letters to Francis, appellant was furnishing the Major additional money on condition that he make this move. According to this letter of February 11, 1925, appellant had hopes that the Major would, from Chicago, "eventually get a total of $350,-000 in cash, and that will clean up everything." According to his letter of May 25, 1925, to D. R. Francis, Jr., he paid the first month's rent of $300 for Major Quinby's Chicago office and guaranteed the entire year's rental of $3300 more. In this letter he also said that "with all the excitement in Pecos County now is the time to sell these lots and get our money out." In other letters to the Francis

brothers he stated that he tried, without success, to get new money for the Major from the bank, first, by telling them that he had read the contract with respondent and that he would get $10,000 per month, of which $2,000 would come to them, and finally, by offering to endorse his paper (this letter was dated January 24, 1925); that the $7,500 note he executed to the Major in December, 1924, was based upon the Major's contract with respondent, but he had not received the payments from the Major under this contract (this letter was dated March 31, 1925); that he had received respondent's notes to discount and out of them was to apply $4,000 on the Francis notes, which he stated aggregated $27,500; and that he had made a new arrangement with Major Quinby whereby he was to get $25 from the sale of each lot on his debt and also $25 to apply on the Francis notes.

The subsequent contract which appellant made with Major Quinby in Chicago March 12, 1925, recited that E. M. Metcalf of Kansas City held title to certain properties in Pecos County, Texas, and that all of said property had been pledged by Metcalf, with the Major's approval, for the purpose of paying his debts. It recited that two contracts for marketing portions of that property had been entered into by Major Quinby, one with respondent and the other with Matt Smith of Chicago, to which contracts Metcalf had "assented by agreeing to make the conveyances subject to payment of the net proceeds, at least to him, for distribution and payment by him in complying with and meeting the several liens and pledges." It further recited that appellant was willing, in order to obtain a pledge of a share in the property and the proceeds, to secure payment of debts of Major Quinby to him and also payment of a new loan, he was making, to accept a conveyance to him by Metcalf. The agreement then went on to state that the property was conveyed subject to the first deed of trust, subject to a $7,500 note of appellant to Francis, to be paid by taking $25 out of every lot sold under the Smith and Brennan contracts, and subject to $27,500 of notes of S. R. Francis, payable to appellant, also to be paid by taking $25 out of the proceeds of the lots sold under the Smith and Brennan contracts after payment of the $10,000 Brennan notes; subject, also, to the 1924 taxes; subject to the payment of the Brennan notes; subject to $2.50 per lot, to be retained by appellant and credited to one Clements; subject to $2.50 per lot to C. R. Francis of Chicago; subject to payment to E. M. Metcalf of Kansas City of $10 per lot; subject to revenue and expenses and the Major's indebtedness to appellant in the amount of $7,000, and to any further loans appellant made to Major Quinby up to $10,000. Appellant testified that this agreement was not carried out, by a conveyance, but that Judge Metcalf continued to hold title. It shows, however, where the money from lot sales was

going. Evidently the idea of crediting anything on the Brennan-Quinby contract and using it for drilling an oil well in Fort Stockton, as stated therein, never occurred to any of them, although none of respondent's obligations were due at that time.

Appellant also wrote letters, which were in evidence, to a Dr. A. L. Bryte of St. Louis, attempting to collect $3600 in notes which Dr. Bryte had given for the purchase of Fort Stockton lots through Daniel's office in St. Louis. In these letters appellant highly recommends the property, tells about the oil excitement in Pecos County, which, he says, is increasing the value of the lots daily, and urges Dr. Bryte to go through with the deal, as he suggest amending it, because of the fact it could not be carried out in accordance with the contract which Daniel made, in which he included more oil lands than Major Quinby owned. It seems that Daniel, as an inducement to purchasers, was giving with the lots an undivided interest in oil leases on certain tracts of land, and that leases on some of the lands included had not been obtained. In all of these letters to Dr. Bryte, appellant stated that he held his notes as collateral to a loan he had made to Daniel.

It seems to be undisputed that none of the proceeds of the lot sales were ever credited on the payments, which respondent was to make to Major Quinby under the contract, or upon his notes, aggregating $10,000, given in connection with the extension contract. Neither does it appear that any of the money, received from lot sales, was ever used in the drilling of the well referred to in the contract or for the benefit of the Stockton Oil Company. The inescapable conclusion, from the evidence, is that all the money received from lot sales, which was not kept by the salesmen or used for expenses, went to appellant to apply upon various obligations of Major Quinby, either direct or in connection with the Francis notes. There were other letters written by appellant to the Francis brothers and other parties disclosing other facts in connection with both the St. Louis and Chicago deals. One letter, written to C. A. McIntyre, an attorney in St. Louis, stated that appellant acted only as a broker in the matter of obtaining loans for Major Quinby and Daniel, and that they had both paid the loans to the banks where he had obtained them, with the lot sales notes and contracts as collateral.

When respondent's $2500 note, payable March 26, 1925, came due, it was found to be in the hands of a St. Louis bank. Respondent paid it, and thereafter his enthusiasm for Major Quinby and his plans chilled rapidly. He employed an attorney who took the matter up with appellant. Appellant wrote two letters to respondent's attorney, one on May 11, 1925, when the second $2500 note came due, and the other on May 25, 1925, after this note was in default. In both of these letters he demanded full payment from

respondent of the notes he held, and in the last one said he would collect from respondent "if he is financially responsible and lives until it can be adjudicated." He stated in both letters that he would use his best efforts to obtain a settlement for respondent of his obligation to Major Quinby under the contract of October 20, 1924. In both of these letters he stated that he had read the original contract, his language in the first letter being as follows:

"In the first place, as I told you in your office, I do not want to mix up this contract between Brennan and Quinby, with these notes. These notes were given to me and Mr. Brennan wrote a letter that they would be paid when due. At the time I received these notes I had never read the supplementary contract and was told that these notes were taken by Quinby, to help Brennan out and avoid his having to pay cash at the time. I never read this supplementary contract until I received it from Judge Metcalf at the Jefferson Hotel last Wednesday morning. I had read the original contract on the basis of which I took the notes and paid for them. These notes were finally sold to the banks and the one due May 11th was owned here in Muscatine by one of the banks and I had to take it up."

The second letter read:

"I have a contract with Quinby, concurred in by Metcalf, trustee, to pay on his indebtedness, evidenced by his notes, $25 per lots on every lot sold. The Francis interests were also to receive $25 per lot on every lot sold in St. Louis, to apply on a $7,500 note of mine which I was induced to give last December, when in St. Louis, based upon the Brennan contract, which Quinby showed me at that time, under which Brennan was to pay $10,000 monthly."

At the trial appellant testified that he had not seen the original contract when he got the notes, but that the payments due under it were explained to him. He testified that he did not obtain the notes until January 10, 1925 (although some of his letters indicated he and the Major were together the latter part of December, 1924). He said he gave Major Quinby a check for $2500 on January 10th; that on January 16 he sent him a check for $1,000; that on January 17 he sent him a check for $1189.34, and paid a protested check for $265; and that on the same date he paid Quinby's note at a bank, which, with interest, amounting to $4045.66, and gave him credit on his open account for $1,000. At the time of the trial Major Quinby had not been seen for some time. It was understood his headquarters were at his father-in-law's home in Chicago, but whenever anyone called for him there he was either down town or in New York. Other facts deemed material will be referred to in the opinion.

Respondent filed an answer containing a general denial and setting up three affirmative defenses, namely: Fraud in the procurement of the notes, by reason of false representations of Quinby that he was

the owner of the property referred to in the contract of October 20, 1924, and could convey the same, in making which, it was alleged that he acted for himself and appellant; want of consideration, because the contract was unenforceable and void under the Statute of Frauds of both Missouri and Texas, for the reason that the lands and oil leases which the contract provided should be conveyed to respondent were not described, and for the further reason that it was not a complete contract without these descriptions and that the entire agreement between the parties was not completely executed; and failure of consideration, by reason of Quinby failing to comply with any of the terms of the contract in payment for which he obtained the notes. The answer alleged that appellant caused Quinby to make the representations and enter into the agreement for the purpose of securing the notes of respondent for the benefit of both appellant and Quinby. It alleged that appellant and Quinby, after the execution of the contract, sold the lots referred to in the contract and appropriated the proceeds. It alleged that appellant knew that Quinby did not and could not carry out the contract at the time he acquired the notes. It further alleged that appellant did not give anything for the notes; that he knew of the failure of the consideration of the contract and knew of all the facts alleged in the answer when he took the notes. The answer concluded with a counterclaim for $2536, which respondent alleged he had paid on the note, due March 26, 1925, to a bank to which appellant had transferred it before maturity and asked judgment against appellant for this amount.

Appellant's reply was a general denial, except that in answering to the counterclaim he admitted that he transferred the note which became due March 26, 1925, to the bank before its maturity and that respondent had paid it.

The parties waived a jury and the case was tried by the court. Upon appellant's request, pursuant to Section 1402, Revised Statutes 1919 (now Sec. 952, R. S. 1929), the court made the following findings of fact and conclusions of law:

*"Findings of Fact.*

"1. That on December 29, 1924, defendant Brennan made, executed and delivered to F. J. Quinby the two notes described in the petition.

"2. That said notes were given by defendant Brennan to Quinby pursuant to an original contract dated October 20, 1924, and a supplemental contract dated December 29, 1924, between Quinby and Brennan, in part execution of Brennan's agreement to pay Quinby $100,000 for 1700 lots, which, by said agreements, Quinby agreed to convey to Brennan, which lots were not described in said contracts,

but were to be described in plats or maps which the contracts recited were attached thereto.

"3. That no plats or maps identifying the lots contracted for were ever attached to the contract or furnished to Brennan; that Brennan made repeated efforts to secure such maps or plats identifying the lots contracted for, but was unable to secure them.

"4. That Brennan received nothing of value as a consideration for his promise to pay, evidenced by the two notes sued upon.

"5. That plaintiff Huttig had, for a long time prior to the making of said notes, been making loans to Quinby, some of them unsecured and others secured by mortgages upon real estate, included in the latter being some of the 3,000 lots at Fort Stockton, Texas, referred to in the contract of October 20, 1924, out of which Quinby was to convey 1700 lots to Brennan.

"6. That at the time the Quinby-Brennan contracts were made, and at the time the notes sued on were given, plaintiff Huttig was co-operating with and assisting Quinby in his efforts to sell the lots referred to in the Quinby-Brennan contract and others, for the purpose of securing to plaintiff the repayment of the moneys which he had loaned and advanced to Quinby.

"7. That the making of the Quinby-Brennan contracts of October 20, 1924, and December 29, 1924, and the giving of the notes by Brennan to Quinby, herein sued on, were all part of a general plan and undertaking between Quinby and plaintiff Huttig to sell these lots for the purpose, among others, of enabling Quinby to repay his indebtedness to plaintiff Huttig.

"8. That plaintiff acquired the notes sued on in December, 1924; that he took said notes at said time for the purpose of discounting them, for which he was to be paid a bonus of $1,000; that at the time he took said notes he gave no valuable consideration for them; that there is no evidence that payments which plaintiff testified he later made to Quinby were made in consideration of the transfer by Quinby to plaintiff of the notes sued on; that before he took them he had seen both the original contract of October 20, 1924, and the supplemental contract of December 29, 1924, and knew their contents and knew that the lots which were to be conveyed to Brennan were not described in these contracts, and that no description of them on maps or plats were attached to these contracts.

## "Conclusions of Law.

"1. The court declares the law to be that if the contracts between Brennan and Quinby of October 20, 1924, and December 29, 1924, contained no description of the lots to be conveyed to Brennan, and nothing by which the lots agreed to be conveyed to Brennan could be identified, and, if no lots contemplated by these contracts, were in

fact conveyed to Brennan, then said contracts were unenforceable and void as between Brennan and Quinby and as between Brennan and Quinby constituted no consideration for the notes herein sued on.

''2. The court declares the law to be that if plaintiff, at the time he acquired said notes, knew the contents of the contracts between Brennan and Quinby, pursuant to which said notes were given, and knew that said contracts contained nothing to identify the lots which Quinby undertook to convey to Brennan, and knew that the notes which he was acquiring were given to Quinby pursuant to said contracts, then plaintiff acquired no greater rights under said notes than Quinby, the payee, would have had.

''3. The court declares the law to be that if plaintiff and Quinby were jointly interested in the sale of the lots referred to, and that the making of the Brennan contracts and the execution of the Brennan notes were in furtherance of the plan of plaintiff and Quinby to sell said lots for the purpose of enabling Quinby to repay to plaintiff moneys which plaintiff had loaned Quinby; and if plaintiff at the time he acquired said notes from Quinby knew that they had been obtained by Quinby from Brennan as part payment for lots which Quinby was agreeing to sell to Brennan in pursuance of such general plan and understanding between Quinby and plaintiff, then plaintiff acquired no greater rights under said notes than Quinby acquired at the time he secured them from Brennan.

''The court declares the law to be that if at the time the plaintiff acquired said notes from Quinby he did not pay Quinby anything therefor, or promise to pay him anything therefor, or give him anything of value therefor, but took said notes merely for the purpose of discounting them, then plaintiff acquired no greater rights under said notes than Quinby acquired at the time he secured them from Brennan.''

The court entered judgment in favor of respondent on both counts of appellant's petition and entered judgment for appellant on respondent's counterclaim. Respondent has not appealed from this judgment. Appellant contends that under the undisputed facts in the evidence he was the holder in due course of the notes and was entitled to judgment on them as a matter of law. He contends that the court's findings of fact, particularly paragraphs 4, 6, 7 and 8, are not supported by the evidence, but are directly contrary to the undisputed evidence. He contends that the first three paragraphs of the conclusions of law are erroneous. He also contends that the court erroneously admitted, over his objection, letters written by him to respondent's counsel which, he says, was in connection with an effort to compromise the matter before suit was commenced.

We have jurisdiction because the amount of the debt sued for, principal and interest, computed to the date of judgment, had appellant been entitled to judgment, would be, according to the allegations of his petition, in excess of $7,500. In a suit on a note the interest demanded is part of the "amount in dispute." [Baerveldt Construction Co. v. Bagley, 231 Mo. 157, 132 S. W. 688; State ex rel. Trust Co. v. Reynolds, 278 Mo. 695, 213 S. W. 804.]

In considering appellant's contention that the findings of fact made by the trial court are not supported by the evidence but are directly contrary to the undisputed evidence, we must bear in mind the following rule, which is well stated in Barnett v. Hastain, 256 S. W. 750, l. c. 752:

"As this is purely an action at law, tried by the court without a jury, . . . the finding of facts made by the court, if sustained by substantial evidence, is conclusive here. [Jordan v. Davis, 172 Mo. 599, 72 S. W. 686; Rausch v. Michel, 192 Mo. 293, 91 S. W. 99; Elsea v. Smith, 273 Mo. 396, 202 S. W. 1071; Wiley v. Harlow, 274 Mo. 171, 202 S. W. 533; Bingham v. Edmonds (Mo.), 210 S. W. 885; Franke v. Franke (Mo.), 213 S. W. 41; Hayes v. McLaughlin (Mo.), 217 S. W. l. c. 264; Cowan v. Young, 282 Mo. 36, 220 S. W. l. c. 872; Mooneyham v. Mynatt (Mo.), 222 S. W. 451; Union Trust Co. v. Hill, 283 Mo. 278, 223 S. W. 434; Crews v. Maupin, 285 Mo. 466, 226 S. W. l. c. 954; Martin v. Hays (Mo.), 228 S. W. l. c. 744; Black v. Howerton (Mo.), 237 S. W. 471-473; Barr v. Stone (Mo.), 242 S. W. l. c. 663.]" No proposition of law is better settled. For other recent cases see Holland Banking Co. v. Republic National Bank, post page 577, 41 S. W. (2d) 815; City of Brookfield v. McCollum, 5 S. W. (2d) 10; Craig v. Rhodes, 298 S. W. 756; Phillips v. Wilson, 298 Mo. 186, 250 S. W. 408. After carefully studying the record, we have set out, at considerable length, the substance of it and our conclusion is that there is substantial evidence to sustain every finding of fact made by the court except one. That one is, the following part of paragraph 8:

"That there is no evidence that payments which plaintiff testified he later made to Quinby were made in consideration of the transfer by Quinby to plaintiff of the notes sued on."

Of course, appellant's testimony is some evidence of the fact. What the court, evidently, meant was to find as a fact that the payments were not made in consideration of the transfer of the notes. However, we deem this inaccurate statement immaterial, since if the other facts found by the court are true and appellant did participate in and have the knowledge of the transactions, which the court finds he did, he would not be a

holder in due course under the statute (Sec. 2680, R. S. 1929) and he would hold the notes subject to the same defenses as respondent would have had against Quinby, regardless of when and what amounts he later paid for them (Sec. 2686, R. S. 1929).

This brings us to a consideration of the court's conclusions of law. There is no assignment of error as to the fourth (unnumbered) paragraph of these conclusions. Since, under the facts found by the court, appellant was not a holder in due course, excluding the matter of fraudulent misrepresentations in the procurement of the notes, regarding which the court made no direct finding, respondent had the defenses against him, of want of consideration and failure of consideration to the notes. The first three paragraphs of the conclusions of law cover both. Under the facts found by the court, there was not only a complete failure of consideration, if there ever was any consideration, at the time appellant acquired the notes, of which he had actual knowledge, but appellant was a party to it actively engaged in bringing it about. (See paragraphs 6 and 7, Findings of Fact.) Therefore, under the facts found by the court (which are conclusive because the evidence supports them) appellant is not entitled to recover under any theory he may advance.

So even though Paragraphs 1 and 2 of the court's conclusions of law were incorrect, as appellant strenuously contends, the judgment should not be reversed. "A correct decision will not be disturbed because the court gave a wrong or insufficient reason therefor."  [Holland Banking Co. v. Republic National Bank, *post* page 577, 41 S. W. (2d) 815.] But we do not think they were incorrect. It is true, as appellant contends, that a contract to sell real estate which does not sufficiently describe the land, so as to be enforceable under the Statute of Frauds, is not void. The Statute of Frauds relates to the remedy only, and not to the validity of the contract. The sole effect of the statute is to render the contract unenforceable by one party against the will of the other (27 C. J. 309, sec. 398). [St. Louis, K. & N. W. Ry. Co. v. Clark, 121 Mo. 169, 25 S. W. 192; Aultman v. Booth, 95 Mo. 383; McGowen v. West, 7 Mo. 569.] It has also been held that because an agreement, not enforceable under the Statute of Frauds, is voidable only, it is a sufficient consideration for a note (8 C. J. 231, sec. 366). [Kratz v. Stocke, 42 Mo. 351; McGowen v. West, 7 Mo. 569; Fletcher v. Lake (Me.), 118 Atl. 321; Mohr v. Rickgauer (Neb.), 117 N. W. 950.] But there is a conflict of authority upon this proposition (6 R. C. L. 671, sec. 79). It will be observed, however, that in the above cases the parties seeking to enforce the note had performed, or were willing to perform, the unenforceable contract for which it was given.

But Paragraphs 1 and 2 of the court's conclusions of·law say nothing about the Statute of Frauds. The findings of fact are that Quinby agreed to convey to Brennan 1700 lots which were not described in the contract, but were to be described in plats or maps which were never attached to the contract or furnished to Brennan; that Brennan made repeated efforts to secure such maps or plats identifying the lots and was unable to secure them; and that Brennan received nothing of value as a consideration for the notes sued on. Search of the record, from cover to cover,·does not disclose anything from which it is possible to tell what lots or leases Quinby intended to make the subject-matter of the contract, or that either he or respondent ever came to any agreement about what lots and leases respondent was to get or what lots or leases Quinby would ever have. The contract stated that he was the owner of approximately 3,000 lots in the city of Fort Stockton, Texas. The evidence discloses that there were many additions to this city and that Quinby contemplated platting another one. The 20,000 acres, for which he was to furnish oil and gas leases, for all the contract shows, might have been anywhere from Texas to Timbuktu. The most the evidence shows is that he had, or had contracted for, some kind of shadowy claims to some property in or near Fort Stockton which some one afterwards conveyed to Judge Metcalf subject to deeds of trusts, liens and claims, the extent of which is a matter of speculation and conjecture.

The following fundamental rules concerning contracts may be, here, properly recalled:

"In order that there may be an agreement, the parties must have a distinct intention common to both and without doubt or difference. Until all understand alike, there can be no assent, and, therefore, no contract. Both parties must assent to the same thing in the same sense, and their minds must meet as to all the terms. If any portion of the proposed terms is not settled, or no mode is agreed on by which it may be settled, there is no agreement." [13 C. J. 263, sec. 48.]

"It is essential to a contract that the nature and extent of its obligations be certain. If an agreement is uncertain it is because the offer is uncertain or ambiguous to begin with, for the acceptance is always required to be identical with the offer, or there is no meeting of the minds and no agreement." [13 C. J. 266, sec. 59.] "A written agreement may be uncertain because of blanks left therein." [13 C. J. 268, sec. 59.] "A writing is incomplete as an agreement where blanks as to essential matters are left in it, unless they can be supplied from other parts of the writing itself." [13 C. J. 308, sec. 133.]

In Hudson v. Browning, 264 Mo. 58, 174 S. W. 393, it was attempted to hold one party liable for refusing to pay for railroad ties

it was claimed he had contracted for. Because the contract did not bind plaintiff to furnish the ties the court sustained a demurrer to the evidence. This court affirmed the judgment, holding the contract void because it was so indefinite as to what plaintiff was to do that there was no mutuality. The court said: "A promise is not a good consideration for a promise unless there is an absolute mutuality of engagement, so that each party has the right at once to hold the other to a positive agreement."

This rule is stated in 6 Ruling Case Law, 677, Section 84, as follows:

"In order that mutual promises may serve as considerations for each other, they must be mutually binding. No promise constitutes such a consideration which is not obligatory upon the party promising. It must bind the promisor, so that the promisee may maintain an action for its breach, or it is without legal effect and void."

In short, if one of the parties is not bound, neither is. Therefore, if there was no agreement or understanding as to what property respondent and Quinby were contracting for, there was no meeting of their minds on *the essential part* of the contract. In that case the document of October, 1924, was not a contract at all and there was no consideration for respondent's notes. Upon that theory Paragraphs 1 and 2 of the court's conclusions of law correctly state the law.

Appellant's final contention is that the court erred in admitting in evidence, over his objection, the two letters written by him to respondent's attorney in May, 1925, in which he stated that he had read the original Brennan-Quinby contract before he got the notes. Appellant says that these letters show that they were written in connection with an effort to compromise or settle appellant's claim upon the very notes in suit. We do not so read them. Appellant was demanding in both of these letters the full amount of these notes. He was offering no compromise of them. He said that he would collect them if respondent lived long enough. He was suggesting, that after respondent paid his claim in full, he would attempt to procure a settlement of Quinby's claim against respondent on their contract. No doubt this was with the idea of getting more of Quinby's debts to him paid. While it is elemental that offers of compromise are inadmissible, against the party making them, in an attempt to compromise his claim, however, when no attempt to compromise his claim is being made or when his statement was made in connection with an attempt to compromise another claim not included in his action, in which such statement is offered, it is admissible (22 C. J. 312, sec. 347). [Moore v. Gaus & Sons Mfg. Co., 113 Mo. 98, l. c. 111, 20 S. W. 975; Newberry v. Missouri Granite & Construction

Co., 180 Mo. App. 672, 163.S. W. 570; Ghio v. Mercantile Co., 180 Mo. App. 686, 163 S. W. 551.]

The judgment of the circuit court is right, and it is therefore affirmed. *Sturgis* and *Ferguson*, *CC.*, concur.

·PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All of the judges concur.