LEE DOBBINS and CORA FOWLER, Appellants, v. CITY BOND & MORT-
GAGE COMPANY, a Corporation, THE LINCOLN NATIONAL LIFE IN-
SURANCE COMPANY of Fort Wayne, Indiana, a Corporation, and
W. O. NORMAN, Trustee.—124 S. W. (2d) 1111.

Division One, February 8, 1939.

*Jay L. Oldham* for appellants.

*Thomas L. Brown* and *Rex B. Parr* for respondents.

LUCAS, J.—Appellants began this suit in the Circuit Court of Jackson County, Missouri, by filing their bill in equity to set aside a trustee's sale and deed alleging there was no default in payment at the time of the foreclosure. The trial judge dismissed appellants' complaint and on the appeal the Kansas City Court of Appeals affirmed the judgment of the trial court, which opinion is found in 116 S. W. (2d) 200, but upon the dissent of one of the judges of said court the case came to this court.

Appellants alleged in their complaint that they were the owners of the real estate in question consisting of two duplex stucco apartment buildings in Kansas City on October 30, and December 19, 1929, at which times they executed their promissory notes in the total sum of $14,000 with interest at the rate of six per cent per annum and which notes were secured by two deeds of trust on said property and were payable to the City Bond and Mortgage Company of Kansas City, Missouri, and that respondent, W. O. Norman, was named as trustee therein and that the payee sold said notes to respondent, The Lincoln National Life Insurance Company. That said notes consisted of two principal notes in the sum of $5600 each and eight principal notes in the sum of $350 each and that the two large notes matured five years after date and the $350 notes matured one, two, three and four years after date. Four of the $350 notes were

paid but four of the $350 notes and both of the large notes were not paid at maturity. The last of said notes matured December 15, 1934.

Appellants further alleged that after said notes matured the indebtedness was renewed and extended by the life insurance company for a definite period of time and for a valuable consideration. That the defendants unlawfully conspired in August, 1936, to foreclose the deeds of trust, and that the property was sold on August 31, 1936, thereunder, and that the life insurance company bid in the property. That appellants gave due notice of intention to redeem from said trustee's sale. That the trustee executed and delivered his trustee's deeds about September 24, 1936, and that respondents thereafter took possession of said property. Other allegations of the complaint are immaterial on this appeal. Appellants asked that the trustee's sale and the trustee's deeds be declared void and that the deeds of trust be reinstated.

The answer of all the respondents, after admitting their capacity, was a general denial.

The decree of the trial court was for the respondents because the evidence was insufficient to entitle appellants to relief.

To support the complaint the appellants produced evidence showing that at the time of the foreclosure there was a principal indebtedness past due on each apartment in the sum of $6300 and that there was interest due on both loans and that the life insurance company had paid taxes which appellants had not repaid and that the total indebtedness due and owing the life insurance company on said notes and for taxes advanced amounted to more than $13,000. Appellants admitted that the delinquencies existed at all times from the maturity of the obligations to the date of foreclosure but claimed that the life insurance company through its agents and representatives had verbally agreed to extend the time of payment of said matured obligations and that the appellants had paid a valuable consideration for said extension by making monthly payments on the debt for a year or more and had paid delinquent taxes on the property. Appellants showed that three of these apartments rented at $50 per month and that appellants occupied the fourth apartment. Heat, water and janitor service were furnished by appellants. When the last note matured the 1933 and 1934 State and county taxes were unpaid and the 1934 city taxes were unpaid. Appellants admitted that at the suggestion of some of the respondents they applied to the Home Owners Loan Corporation for a loan but were rejected. It was admitted that W. O. Norman, the trustee, was an officer of the City Bond and Mortgage Company and that said company serviced this loan and that appellants were in constant communication with Norman about this loan. On January 7, 1935, appellants paid taxes

in the sum of $144.03 concerning which Mrs. Fowler testified as follows:

"Q. How did you come to pay these taxes after the loan was past due? A. I was assured by Mr. Norman that if we did this, our properties would not be taken from us and on his word of honor put out our good cold cash.

"Q. I had you Exhibit One and will ask you what it is? A. This is a check I wrote in Mr. Norman's private office at his request that if we would put up $100 that day to show our good faith in this agreement that these properties would not be foreclosed on us and he would take it up with the insurance company *and get a new extension agreement*—whatever you want to call it—on this property."

This check was dated March 2, 1935. She further testified that "he was still writing back and forth with the insurance company about the extension." She also stated that the insurance company was wanting $65 each month on each apartment but that she had agreed to pay only $50 a month on each apartment. She admitted that the insurance company had advised her by letter, dated June 14, 1935, as follows: "We wish you would please notify Mrs. Fowler that we will be willing to carry these loans past due for the next three months in consideration for her making monthly payments of $65 on each loan and if she is able to keep up this monthly payment schedule for the next three months we will then be willing to give consideration to renewing and increasing these loans." Referring to this letter she testified, "Yes, sir, that is the remark he made. I wanted to get them to agree to the renewal; then I would get them down to the $100." She stated that she paid the 1933 State and county taxes because Mr. Norman assured her that she would not lose the properties. She paid city taxes for the same reason and said that Mr. Norman told her that, "if we would pay these taxes, he would see that our properties were not taken from us and *he would get the loans extended for us.*" She further testified that about the first of October, 1935, Mr. Linhart, a field representative of the insurance company and Mr. Wornall, an officer of the City Bond and Mortgage Company called on her for the purpose of looking over the properties and asked her what they were going to do about the past due loans. She said, "I told him we were going to do just what we had promised Mr. Norman, along the same lines we had been going all these months. He wanted to know if we could not possibly make payments more than $100 and I said that we figured we could not make more than $100 a month, ten months in a year, and keep up the taxes and the insurance and upkeep on the properties. That was agreeable with Mr. Linhart. . . . and I told him one thing I wanted understood thoroughly and that is, if I made the $100 a

month payment ten months in the year and pay the taxes, that is, I would not let them accumulate like they had been, and the upkeep, I would still be in good standing on my loan, and he assured me I would be." About $70 worth of repair work was also done on the properties. Appellants made payments of $100 each month from March 2, 1935, but sometimes the payments were made in two installments of $50 each and these payments were properly credited and admitted, except that appellants claimed they sent a $100 check dated July 24, 1936, to the City Bond and Mortgage Company but that said check was never cashed. Respondents deny that they ever received this check. She admitted that on June 23, 1936, she received a letter from the City Bond and Mortgage Company advising her that the insurance company requested her to pay the 1935 State and county taxes by June 25, 1936, and that if she failed to pay them *that the deeds of trust would be foreclosed.* She said that she then called Mr. Wornall and told him that in October, 1935, she had made an agreement that she would have a year's time after the taxes were due in which to pay them. She further stated, "I had money on hands to pay them and went to the Collector's Office to see about getting a reduction and was advised to fill out an order in the Collector's Office and that it would take six weeks to get the reduction. I notified Mr. Wornall to that effect, and he insisted that I bring the $300 down there until the abatement went through and I asked what security he would give me for the $300. He said he would give me a receipt. I said I wanted security that I could have the money as soon as I got the abatement to pay the taxes with and he refused to give me the security. Therefore, I didn't take the money down." She admitted that on June 26, 1936, she received a letter advising her that since 1935, State and county taxes had not been paid, that the insurance company was being advised accordingly. She further testified that she was willing to take the tax money down to the City Bond and Mortgage Company provided she was given ample security for it but that the City Bond and Mortgage Company would not give her any collateral. She admitted that she received a letter from Mr. Wornall dated July 9, 1936, advising her that these loans would be foreclosed immediately but that if she would pay the 1935 taxes or deposit sufficient money to cover these taxes that they would await the action of the county court on the reduction of the taxes. She testified that she called Mr. Wornall and again told him she would not deposit the $300 unless he would give her security for the money and that he refused to do so. She further admitted that she received a letter dated August 10, 1936, enclosing a copy of the trustee's sale notice for August 31, 1936. The sale was held August 31, 1936, and the insurance company immediately notified the tenants not to pay rent to appellants. At the foreclosure sale notice of redemption was given but no bond was ever posted.

Appellants continued to occupy the apartment and the insurance company brought unlawful detainer but that was dismissed and appellants remained in possession of one apartment pending this litigation. Appellant Fowler testified that during the time between the maturity of the last note and the foreclosure that she paid out for gas, water, State, county and city taxes, papering, painting, redashing of building and insurance and to the City Bond and Mortgage Company, $3846.03 of which amount $1523.93 was paid to the City Bond and Mortgage Company on the indebtedness held by the life insurance company. She further testified that the income from the property during this same time was $3685.03. She further testified that she did the janitor work, interior painting, sanding of the floors, etc., and that the buildings had cost them $24,500. She was asked,

"Q. How long were these payments to go on at $100 a month? A. Until such time as we got the loans down to where they would be put into a straight loan.

"Q. Did he tell you how much of a straight loan he would make? A. No sir, he didn't."

She admitted that no agreement to renew the loan had ever been made in writing and that the only consideration for the extension was the monthly payments, payment of taxes and upkeep of the property. There was no evidence of any conspiracy. Appellants relied wholly upon the conversations between Mrs. Fowler and Mr. Norman and Mr. Wornall and Mr. Linhart to establish the extension agreement. Appellants admitted that no $100 payment was made for the months of July and August, 1936, but say that they paid the June installment by sending a check dated July 24, 1936, but admitted that said check was never cashed. The insurance company paid the 1932 State and county taxes and the 1932 and 1933 city taxes and the appellants had not reimbursed it for these payments. Appellants admitted that they never received a letter at any time from anybody confirming an arrangement to pay $100 a month for ten months in the year.

Witness Leatha Dobbins, the mother of appellants, testified that she was present when Mr. Linhart and Mr. Wornall talked to Mrs. Fowler and her testimony conformed to the testimony of Mrs. Fowler. She was not cross-examined. Appellant Dobbins testified that in March, 1935, he talked to Mr. Norman about these loans and that he told Mr. Norman that "we could make monthly payments until we got caught up" and Mr. Norman wanted $150 a month but Dobbins said he could not pay over $100 a month and told Dobbins that if Dobbins would give him a $100 check that he, Norman, would write to the home office and see what could be done and that Norman then called Mr. Wornall in the conference. Dobbins testified he was rejected by the H O L C and that his sister, Mrs. Fowler, looked after the management of the property.

Witness Norman testified that he had no authority from the life insurance company to make any extension agreement and that he never at any time made any extension agreement of this indebtedness and denied the testimony of Mrs. Fowler to the effect that he had promised to save the properties for her. He admitted having many conversations and conferences with Mrs. Fowler about these properties and admitted that he attempted to assist her by advising her and that he accepted all money and checks that were tendered him by appellants but that the indebtedness was never up to date at any time. He positively denied that he had told appellants that payment of taxes would prevent a foreclosure. He also denied that he was at any time authorized or willing to accept $100 a month and renew the loans.

Mr. Wornall testified that when Mr. Linhart and he called on Mrs. Fowler that they "proceeded to work out an arrangement whereby Mrs. Fowler and Mr. Dobbins were to pay $50 monthly on each one of the duplexes, and in addition thereto were to keep the taxes current.

"Q. What do you mean by 'current'? A. Paid prior to delinquencies."

Wornall testified that he never at any time agreed to extend the loan and that appellants had been given credit for every payment they had made. He also testified that he believed the company would have gone along with appellants if appellants had made the $100 payment each month and had paid taxes on the property before the taxes became delinquent.

So much for the evidence. On this record we are of the opinion that the trial court properly dismissed appellants' bill and that the Kansas City Court of Appeals reached the proper conclusion and that the dissenting opinion in said court is wholly unsupported by the evidence or by the authorities relied on in the dissenting opinion.

Doubtless appellants are suffering a loss but respondents are in no way responsible for it. The indebtedness was due at the time of foreclosure, unless there had been an extension of the due date of said indebtedness. To support the alleged extension agreement appellants rely wholly on oral evidence. It is conceded that an extension agreement may be proven by parol evidence. [Baade v. Cramer, 278 Mo. 516, 213 S. W. 121.] However, such parol evidence must meet the requirements as laid down in Masonic Home v. Windsor, 338 Mo. 877, 92 S. W. (2d) 713, where it is said:

"While equity will intervene in a proper case to relieve against fraud or mistake in a trustee's sale, fraud or mistake is not to be presumed, but should be proved by clear, convincing and cogent evidence or circumstances."

The evidence of the appellants does not go beyond the point of negotiations for a renewal of the loan or an extension of time of pay-

ment. The letter of June 14, 1935 to Mrs. Fowler stated that the insurance company would accept payments of $130 a month for three months and then consider the question of renewing the loan. Appellants did not make these payments. There is no evidence to show that Mr. Norman, Mr. Wornall or Mr. Linhart had any authority whatever to extend this loan, and even if the testimony of Mrs. Fowler were accepted as conclusive, yet appellants would still fail because of lack of authority of these gentlemen to bind the company in extending time of payment. All of her testimony about extending the loans is denied by the three witnesses with whom she talked, and the weight of the evidence is strongly against the appellants and appellants have wholly failed to produce the clear, cogent and convincing evidence required in such cases before the complainants can be relieved.

Appellants' evidence clearly shows that Mrs. Fowler was attempting to dictate to the respondents what should be done, that is, she wanted to make her own terms and then after she had made them, to assume that respondents had accepted them. Her evidence plainly sets out her dictation of terms, but her evidence just as plainly failed to show any acceptance of her terms by the respondents. She says that she was to pay $100 ten months in the year and permit her taxes to go delinquent, provided that there were not two years' delinquent taxes at the same time. At no time as shown by evidence did respondents accept or agree to such terms. On the other hand respondents wanted $130 (or as witness Wornall says $100) each month twelve months in the year and taxes kept current and certainly the word "current" as here used means payment before delinquency. Appellants never accepted these terms of the respondents and never complied with respondents' request. Therefore, there was never a meeting of the minds of these parties on the essential elements of a contract of extension which essential elements are, (1) a definite due date of the indebtedness, (2) a definite amount payable monthly and (3) when the taxes should be paid.

The parties hereto never agreed upon a due date of the indebtedness. There were merely offers from each side and neither side accepted the offer of the opposite side. The rule is laid down in State ex rel. Equitable Life Assurance Society v. Robertson et al., Judges, 222 Mo. 206, 191 S. W. 989, l. c. 991, as follows:

"It is elementary that in order to make a contract there must be, among other things, a meeting of the minds of the contracting parties regarding the same thing, at the same time. The negotiations or preliminary steps taken by the parties leading up to the making of a contract do not of themselves constitute the contract. The contract is not complete or consummated until the proposition of the one is presented to the other and by him accepted as presented without conditions or qualifications. In other words, the acceptance of the

proposition presented by the one must be accepted by the other in the form tendered; and if the acceptance omits, adds to, or alters the terms of the proposition made, then neither party 'to the negotiations is bound. So long as any element of the proposition is left open, the contract is not complete and, of course, not binding on any one. The following authorities so hold.'' (Cases cited.)

The same rule is well stated in 12 American Jurisprudence, page 526, section 28, where it is said:

''If a proposal is one merely to open negotiations which may or may not ultimately result in a contract, it is not binding though accepted. An invitation to enter into negotiations is not an offer which, together with the acceptance thereof, forms a contract. Such a proposal may be merely a suggestion to induce offers by others. Care should be taken not to construe as offers letters which are intended merely as preliminary negotiations. A general offer must be distinguished from a general invitation to make an offer. Performance of the conditions of the former makes a legally binding contract, whereas compliance with the requirements involves nothing more than an offer, which may or may not be accepted by the party who issued the invitation therefor.''

Appellants' case was founded on the charge that there was a complete agreement and contract between them and the respondents which the respondents refused to carry out. It is, therefore, necessary for appellants to prove the existence of such a contract in order to have the relief sought by them. [Reynolds et ux. v. South Side National Co. et al., 64 S. W. (2d) 297.]

An extension agreement of a past due indebtedness must not only extend the date of payment to a definite date so that the contract of indebtedness may not be prematurely enforced against the debtor, but also in order that it may be enforced at a definite date for the protection of the creditor. Absent such a definite due date there is no valid extension agreement because there is no agreement that is enforcible for the protection of the parties thereto.

An agreement to extend time of payment of a matured debt must be supported by a new and independent consideration. Promises to do or perform an act that is already obligatory on the parties, or either of them under the old contract is not sufficient to support a new contract, such as a contract to extend the date of payment of a due debt. In this case appellants failed to produce any evidence requiring them to do a single thing that they were not already obligated to do because they were obligated (1) to pay the debt, (2) to pay the taxes, (3) to keep the property in repair, (4) to pay the insurance, (5) to care for and look after the property. Nothing new was promised by the debtors. It is true the debtors were not obligated to make monthly payments under the original

notes, but said notes had all matured and the entire debt was due, so when appellants were making monthly payments they were merely paying on their debt and respondents were accepting said payments and crediting the indebtedness. Appellants were receiving the income from the property and were occupying the property and during the entire time that the indebtedness was delinquent the income from the property together with the occupancy of one apartment by appellants exceeded the amount of money that appellants paid to respondents and for taxes, repairs, insurance, etc. Had appellants not made these monthly payments to respondents, respondents could have foreclosed any time, after December, 1934. The indebtedness was allowed to run delinquent merely as an accommodation to the appellants with the hope that appellants could eventually refinance the obligation. 12 American Jurisprudence, page 607, section 113, states the general proposition as follows:

"To be sufficient consideration, the promise must, however, relate to an act or forbearance which, if performed, could be treated as the consideration for a contract. Thus, a promise to perform an act which such promisor is already bound to perform is insufficient consideration for a promise by the adverse party."

The parties must have a distinct intention, common to both, and without doubt or difference. Unless all the parties understand alike there can be no assent and therefore no contract. Both parties must assent to the same thing in the same sense and their minds must meet as to all the terms. If any portion of the proposed terms is not settled, or no mode is agreed upon by which it may be settled, there is no agreement. [Huttig v. Brennan, 328 Mo. 471, 41 S. W. (2d) 1054; 13 C. J. 263, sec. 48.] Under the evidence in this case respondents could not have compelled appellants to perform any other contract than the original contract, because there had been no different contract made. Likewise, appellants could not have compelled respondents to have postponed the enforcement of the original contract. The parties were merely negotiating at all times after 1935 when H O L C rejected the application of appellants, and these negotiations continued through the latter part of 1935 and the early part of 1936 without any new contract being entered into. Then when appellants did not accept the offers as made by respondents such as paying $100 or $130 each month and paying taxes before they became delinquent, the respondents elected to foreclose the deed of trust which they had a perfect right to do. Respondents had received nothing of value from appellants in addition to what appellants already owed respondents and under the evidence respondents had not agreed to carry the delinquent loan for any specified length of time.

This court in the case of State ex rel. Hoyt v. Shain et al., 338 Mo. 1208, 93 S. W. (2d) 992, l. c. 998, said:

"Nothing is better settled in this State than that a subsequent agreement, which does not form any part of an original contract, nor is supported by the original consideration thereof, nor by any new consideration, is a mere nude pact, of no force or validity."

In our opinion the respondents never at any time misled or practiced any fraud upon the appellants, on the other hand the evidence discloses that respondents were considerate of the appellants and were endeavoring to assist appellants in refinancing this heavy indebtedness on their property, but that when the appellants were unable to keep the taxes paid or to make payments on the debt in sufficient amounts to materially reduce the indebtedness, respondents decided to foreclose the property and take over the management of it with the view to protecting their lien on the property. The record discloses that respondents were, even up to the time of the trial, perfectly willing to deed the property back to appellants if appellants could pay the debt against it. Of course that tender is of no avail to an insolvent person but it does show the willingness of respondents to accept the money rather than the property for the indebtedness.

The record discloses that appellants not only failed to accept and comply with the offers made by respondents, but that the appellants even failed to comply with their own offers. Under this evidence we are of the opinion that appellants failed to establish a new contract either verbal or otherwise whereby the time of payment of this indebtedness was to be extended or renewed and for these reasons appellants' complaint was properly dismissed by the trial court and the judgment should be affirmed. It is so ordered. All concur.