HYMAN SPITCAUFSKY v. STATE HIGHWAY COMMISSION OF MISSOURI, Appellant.—159 S. W. (2d) 647.

Division Two, December 16, 1941.

Rehearing Denied, March 13, 1942.

118

*Louis V. Stigall* and *Wilkie Cunnyngham* for appellant.

*J. L. Milligan, Clifford B. Kimberly* and *William E. Durham* for respondent; *James T. Blair* of counsel.

ELLISON, J.—This case has been reassigned to the writer. The plaintiff-respondent was the successful bidder for the construction of a State road project designated as Route SE., Sec. 2, in Platte County, to be completed on December 1, 1936. After the work had started the defendant-appellant State Highway Commission (hereinafter called the Commission) changed the design for a large culvert. The Commission claimed the change was necessitated by soil conditions revealed by excavation and by respondent's faulty method of excavating for the culvert as originally designed. The respondent contended his method of excavating was correct; that it conformed to the directions of the Commission's supervisors; that the Commission's action was arbitrary and capricious, constituting a breach of the contract; and that the change was material, having increased the cost and delayed the progress of the work to an extent which he could not have anticipated when he bid on it. It was not finished until the following spring, on May 28, 1937. The Commission allowed respondent an extension of time to January 28, 1937; but refused to sanction the whole delay, and withheld $1500 from respondent's compensation as liquidated damages because of the remaining time arrearage, under a clause of the construction contract.

Respondent thereupon brought this suit. In the first count of his petition he sued for the aforesaid $1500 balance of the contract price, alleged to be due because of the Commission's breach of the contract, and recovered a verdict for the full amount. The second count was for $6145 damages claimed for increased cost of supervision and

rental value of equipment, due to the delay and unfavorable weather. On that count the verdict was for $700. The third count, added by amendment a year after the institution of the suit, was for the cost of materials furnished as agreed upon and used in heating concrete aggregates to prevent freezing, in the amount of $100. The verdict on that count was for $119.72. The judgment was for the sum of these several verdicts, $2319.72, with about nineteen months' interest on the first and third items.

The testimony for respondent and his superintendent concerning the delay is very indefinite. As we understand it, excavation work for the culvert started about the middle of September. At the depth called for by the plans no sufficient rock footings were found and the Commission's engineer required two feet further excavation. Instead of merely digging a separate trench for each of the three bridge supports as the engineer advised but did not demand, respondent blasted and excavated the whole area necessary to include all three supports. All this took about two weeks. Then work was suspended on order of the Commission for about two weeks, and new plans were substituted calling for backfilling the whole excavated area 4 or 5 feet and constructing a concrete floor thereon as a base for the bridge supports. This backfilling took about two weeks, and altogether there were about four weeks delay in a total elapsed time of six weeks extending to about November 1.

There is not much controversy on these dates. The Commission's supervising engineer testified from his diary that respondent was notified of the redesigning of the culvert on October 17; and that backfilling was commenced on October 21 and finished on November 1. However, this witness stated respondent was engaged in excavating during the whole month from September 14 to October 14, thus in effect denying that it was completed in two weeks and suspended for two weeks before backfilling began. The new plans required different steel for the culvert and construction work thereon did not begin until December 1. The weather turned cold unusually early that winter with sleet on the ground for six weeks. Respondent had expected to finish all the work late in October. But the Commission's supervisor, just mentioned, declared there were shutdowns from time to time because of breakdowns in respondent's excavating machinery.

The Commission's most elaborately briefed contention is that the trial court erred in receiving the three verdicts and entering judgment thereon because all were for extra compensation outside of the written construction contract, and to be paid out of the State Treasury from funds appropriated by the Legislature. It is asserted this would violate Sec. 48, Art. IV of the State Constitution and Sec. 8764, R. S. 1939, Sec. 8116, Mo. Stat. Ann., p. 6900. The constitutional provision contains two clauses. In quoting it we emphasize certain words and mark the second clause with an asterisk for convenience in reference:

"The General Assembly shall have no power to grant, or to authorize any county or municipal authority to grant any *extra* compensation, fee or allowance to a public officer, agent, servant or contractor, after service has been rendered or a contract has been entered into and performed in whole or in part, *nor pay nor authorize the payment of any claim hereafter created against ▇▇▇ the State, or any county or municipality of the State, under any agreement or contract made without *express authority of law*; and all such unauthorized agreements or contracts shall be null and void." Under the Statute, Sec. 8764, supra, contracts for the construction of parts of the state highway system must be furnished and prescribed by the State Highway Commission, and let to the lowest responsible bidder after published advertisement. Otherwise they are not authorized by law.

The Commission construes the first clause of the constitutional provision as prohibiting payment of extra compensation to a contractor in the sense of compensation *outside* the terms of a *legal* contract; and the second as forbidding payment of a claim under an *illegal* contract, meaning any contract not made as prescribed by Sec. 8764, supra. Both parties concede the written construction contract actually entered into was legally made. But the Commission asserts it exclusively provided for payment at unit prices on the quantities of work actually done; and does not authorize the payment of compensatory damages en gros, certainly not in an amount above the stipulated contract price. Hence the contention is made that if respondent is entitled to the amounts sued for and recovered it must be under some other and different contract which was not advertised and let to the lowest bidder, as required by the second clause of the constitutional provision and Sec. 8764, supra. And the Commission further says that even if it be conceded respondent might otherwise recover on the claims asserted in counts 2 and 3 of the petition, still he cannot do so in this instance because he failed to give 60 days detailed notice of said claims, and to prove the Commission's Chief Engineer had certified the amounts sued for and recovered were due and that the work had been satisfactorily completed—all as required by the contract and specifications. There are other assignments of error in the Commission's brief, on the admission and exclusion of evidence.

▇ The authorities are uniform on the second proposition advanced by the Commission, as stated at the beginning of the last paragraph— that it cannot pay a claim under a contract which is not authorized by law, in this instance Sec. 8764, supra. Two cases in point cited from other jurisdictions are Diamond v. City of Mankato, 89 Minn. 48, 53, 93 N. W. 911, 912-3, and Chippewa Bridge Co. v. City of Durand, 122 Wis. 85, 99 N. W. 603. As stated in the Diamond case: "The law is well settled that where, as in this case, municipal authorities can only let a contract for public work to the lowest responsible bidder, the proposals and specifications therefor must be so framed as

to permit free and full competition. Nor can they enter into a contract . . . containing substantial provisions beneficial to him, not included in or contemplated in the terms and specifications upon which bids were invited. The contract must be the contract offered to the lowest responsible bidder by advertisement.'' This is not new doctrine in Missouri. [See United Construction Co. v. St. Louis, 334 Mo. 1006, 1020-1, 69 S. W. (2d) 639, 646(6).]

 The first general proposition laid down by the Commission— that under Sec. 48, Art. IV of the Constitution it cannot pay extra compensation to a contractor outside the terms of a legal contract—is equally well founded on authority. Two foreign decisions cited by the Commission are Carpenter v. State, 39 Wis. 271, 282, and Weston v. State, 262 N. Y. 46, 49 et seq., 186 N. E. 197, 198, 88 A. L. R. 1219, 1222. But the Weston case further concedes that if the contractor is subjected to increased expense by the *negligence* of the State (in the instant case, the State Highway Commission) or for extra work not called for by his contract, or which the conduct of the State alone rendered necessary, then the contractor may claim extra compensation therefor. So, too, the respondent refers to several decisions holding that a contract for construction work carries with it an *implied* covenant that the contractee will avoid unreasonable delay, and will furnish within the stipulated time, or a reasonable time, the right of way or site for the construction work and adequate plans and specifications; and that a failure to do so will be deemed a breach of the contract. [See: Griffin Mfg. Co. v. Boom Boiler & Welding Co., 90 Fed. (2d) 209, 212(8); Bay City v. Frazier, 77 Fed. (2d) 570, 572 et seq.; Hart v. American Concrete Steel Co., 278 Fed. 541, 285 Fed. 322; Robert Grace Cont. Co. v. C. & O. N. Ry. Co., 281 Fed. 904; Bates & Roberts Const. Co. v. Board of Commrs., 274 Fed. 659, 661 et seq.; Hinds v. Hinchman-Renton Fireproofing Co., 165 Fed. 339, 341.]

The Commission answers that in all these Federal cases the litigants were not protected by a constitutional provision like Sec. 48, Art. IV of our Constitution. That is true. But in the Bates case there was a statute requiring the contract to be advertised and let to the lowest bidder; and in the Bay City case Sec. 3, Art. 16 of the Michigan Constitution was substantially like the first clause of said Sec. 48, Art. IV. Furthermore, in Davis Const. Co. v. State Highway Comm., 141 S. W. (2d) 214, with several of the same opposing counsel who appear here, the Kansas City Court of Appeals affirmed a similar judgment for the contractor, though we do not find that court's attention was called to the Constitutional provision and statute, supra. [See also Christeson v. State Highway Comm. (Sp. Ct. App.), 46 S. W. (2d) 906.]

Before entering into a discussion of the further facts of this case and of the law applicable thereto, we should refer to another decision

cited by both sides: Hillside Securities Co. v. Minter (en banc), 300 Mo. 380, 254 S. W. 188, which is followed in Scott v. County of St. Louis, 341 Mo. 1084, 1088, 111 S. W. (2d) 186, 187. These cases were dealing with a statute (now Sec. 13768, R. S. 1939, Sec. 12109, Mo. Stat. Ann., p. 6425) which allows a contractor to recover against a county on a quantum meruit for work and labor done or materials furnished in good faith in fulfillment of a contract, though the county authorities may not have pursued the form of proceedings prescribed by law in making the contract. Both decisions ruled that in view of the constitutional provision, supra, said statute, Sec. 13768, applies only where the parties have failed "to pursue the *form* of proceedings prescribed by law in executing a contract otherwise authorized by law;" and not where the parties have failed to follow "the *prescribed procedure* leading up to the making of the contract itself." In the Hillside case the contractor's bid had been accepted and the work done on plans other than those prepared by the county highway engineer, in violation of Sec. 8596, R. S. 1939, Sec. 7947, Mo. Stat. Ann., p. 6797. In the Scott case there had been no petition for street improvements signed by a majority of the resident property owners as required by (now) Sec. 8567, R. S. 1939, Sec. 7920, Mo. Stat. Ann., p. 6787. The contractor was denied a recovery under Sec. 13768 in both cases.

These decisions strictly are not in point here because Sec. 13768 applies only to *counties,* and there is no such exceptional statute applicable to the State Highway Commission. Its contractual engagements are governed exclusively by Sec. 8764, cited at the outset (which is comparable to Secs. 8596 and 8567 referred to a few lines back). And unless the contracts made by it comply with that section they are not "authorized by law" as the second clause of the constitutional provision requires. Both the Hillside and Scott cases are authority for the Commission's contention this far—that respondent cannot recover if the claims on which he sued are *outside* the written construction contract, and are different from those any other bidder at the letting legally could have asserted in the same circumstances if the contract had been awarded to him.

On the other hand, if, as respondent's cases hold, there was an *implied* covenant in the construction contract, that the Commission would not delay the completion and increase the cost of the project by arbitrary and capricious changes in the plans and specifications after the work began, then that covenant was as much a part of the contract as if it had been written in it. [13 C. J., sec. 521, p. 558, 17 C. J. S., sec. 328, p. 778; 12 Am. Jur., sec. 239, p. 765.] Hence a suit based on the implied covenant would not involve a deviation from the contract, and respondent would be entitled to recover on due proof of the facts—unless the contract authorized the action taken by the Commission, fixed his compensation in such a contingency, or liquidated the damages ensuing therefrom. We are unable to go so

far as to hold the constitutional provision and statute, supra, protect the Commission altogether from *breach* of its own valid contract.

So the case hinges on the proper construction of the contract. It required respondent to do, at his own *proper* expense, all labor necessary and to furnish all materials called for in the plans and specifications, including various designated documents such as the Standard Specifications* of the Commission, the contractor's Proposal and all "change orders and supplemental agreements." These were expressly, made a part of the contract. Bids were submitted at unit prices on the Commission's estimated quantities of the various classes of road and bridge work, and the contract was awarded on that basis. But the successful bidder was to be paid at those unit prices for the work actually done. Nothing was separately allowed for cost of superintendence and materials and rental value of machinery, or for delay in furnishing plans and specifications, as sued for in counts 2 and 3 of the petition.

The contract itself was short. Practically all details were covered by the Standard Specifications included therein by reference. It may be said without criticism that these afforded a large measure of protection to the Commission and very little to the contractor. Under Sec. D-3 thereof the Commission's Chief Engineer had the discretionary right to change the plans for the work provided they did not *materially* change the general features of the original. Material changes were defined as "those made necessary by the exigencies of the work resulting in the alteration of costs to the Contractor by an amount which could not have been foreseen or estimated at the time of his bidding upon the work."

Under Sec. I-6 the Chief Engineer similarly could suspend prosecution of the work, even indefinitely, because of weather or other conditions or default of the Contractor. Under Sec. B-5 and Div. II, Part. A, Sec. 1-18, the Contractor was required to examine the work site and could not rely on tests and estimates of excavation depths for footings shown on the plans, these being declared approximate only. The respondent in his contract represented he was fully informed of conditions from personal investigation. Sec. I-7 made time the essence of the contract. If changes in plans involved additional work the contractor was entitled to an extension of time based upon certain weighted time tables on file in the Commission's office, but bad weather conditions would not excuse a suspension of work unless authorized by the Chief Engineer. And Sec. E-1 gave the Chief Engineer the conclusive right to determine whether the rate of progress made was reasonable. The granting of an extension of contract time would only protect the contractor against a claim for liquidated damages at $15 per work day under Sec. I-8, for the delay thus excused.

---

*This is a handbook of 478 pages issued in 1935.

Bearing in mind the rule announced in the decisions cited by respondent, supra, that the contractee impliedly covenants to furnish the site and plans and specifications within a reasonable time, and thereby avoid retardation of the work (especially where a time limit for completion is imposed)—bearing that rule in mind, we say, what would be the effect of a deliberate violation of it in a case where the contract reads as does the one here? Suppose changed plans and specifications are not furnished for a fortnight or a month, during which time the contractor has his salaried work crew and equipment assembled but with no work to do. Releasing him from liquidated damages for the delay and paying him unit prices for the additional work done would not compensate for that.

Yet several provisions of the Specifications, literally construed, indicate that is all he could get. Thus Sec. D-3, supra, provides that if changes in the plans increase or decrease the total amount of work originally contemplated not exceeding 25% of the bid price, the contractor is bound to accept payment in full at the contract unit prices for the actual work done. In this instance the bid price on the estimated quantities was $15,808.20. The addition of 25% for increased work due to changes in the plans would make a total of $19,760.25. But the Commission's final estimate showed the total cost of the work actually done was $19,514.97, which was within the 25% increase and therefore would limit respondent's compensation to that figure.

A later provision in the same section—D-3, may seem to indicate the contrary, but we do not think it does. It declares increases and changes in the work or plans which are not *material* (in the sense of unforseeable) will not constitute a basis for a damage claim— which implies the converse also is true, that if the changes *are* material they will support such a claim. That is the theory on which respondent brought this suit. But the provision first mentioned above, about increases within a 25% maximum, evidently limits this second one and means that a contractor is bound to anticipate changes involving increases up to 25% of the bid price. So there is nothing in Sec. D-3 to relieve the contractor of the hardships mentioned in the second preceding paragraph. Also Sec. D-4 requires the contractor to do extra work *outside* the plans and specifications at agreed unit prices or on a "force account" cost plus basis, which work certainly could not be foreseen or estimated in advance. The respondent's Proposal agreed to this. And Sec. J-2 sweepingly restricts the contractor to the contract compensation for all labor, materials and equipment furnished or used, as well as for damages caused by the elements or the nature of the work and for expenses occasioned by suspension of operations.

Without attempting to construe or harmonize these various provisions further, we are convinced all of them presuppose reasonable action on the part of the Commission. Long delay tying up the

contractor's equipment and otherwise increasing his overhead expense obviously would cause damage which would not be satisfied by paying only the regular contract prices due where there has been no such delay. If the change in plans requires increased work, the greater the increase the more the additional profits would tend to absorb damages resulting from attendant delay. But that is not the theory of the specifications. Sec. D-3 limits the contractor to regular unit prices if the increased work is *less* than 25%. So far as concerns the constitutional question raised by the Commission, we hold in line with the Weston case, supra, 262 N. Y. l. c. 50-51, 186 N. E. l. c. 198, 88 A. L. R. l. c. 1222-3, and the Federal cases cited by respondent, that if the delay here was caused wholly by unwarranted action of the Commission, Sec 48, Art. IV of the State Constitution and Sec. 8764, supra, of our statutes do not bar recovery of compensatory damages by respondent. We cannot read into the contract a provision denying him that right though he was prevented from performing the contract solely by the wrongful interference of the Commission.

But the question just decided does not dispose of the whole case. Granting arguendo that respondent otherwise would be entitled to recover, the Commission says he failed to give 60 days detailed notice of his claims sued on in counts 2 and 3 of the petition as required by Sec. H-14 of the Specifications, and also failed to prove the Chief Engineer had certified the amount sued for was due and that the work had been satisfactorily completed in due time, as required by Sec. E-1. It is contended that if respondent be paid out of State funds in disregard of these sections, he will thereby be exempted from substantial requirements of the contract to which other bidders were subject—which would mean he is recovering on a contract *different* from that on which bids were received in violation of the constitutional provision and Sec. 8764, supra.

Sec. H-14 provides that "as a condition precedent to the filing, by either party in any court, of an action against the other party, arising out of the contract," a full, complete and itemized 60 days' written notice of all claims of any character shall be given the other party. Respondent maintains the failure to give said notice does not bar a recovery by him for two reasons. The first is that Sec. H-14 only applies to claims *founded on* the construction contract, and not to claims for *special* damages caused by material changes in the original plans. On that point he cites several cases involving carriers' contracts requiring notice of damage claims: Dunn v. H. & St. J. Rd., 68 Mo. 268, 279; Morrow v. Mo. Pac. Ry. Co., 140 Mo. App. 200, 209, 123 S. W. 1034, 1037; Aull v. Mo. Pac. Ry. Co., 136 Mo. App. 291, 297, 116 S. W. 1122, 1124. But those decisions were based on the fact that common carriers have only a restricted right to contract against their common law liability. It is said the purpose of such stipulations, absent anything to the contrary, is to give the carrier an early opportunity to investigate the alleged loss and to inspect the damaged property. 10 C. J., sec. 476, p. 328; 13 C. J. S., sec. 125,

p. 463; Rice v. The K. P. Ry., 63 Mo. 314, 319; Riddler v. Mo. Pac. Ry. Co., 184 Mo. App. 709, 713, 171 S. W. 632, 634. And in Bailey v. Mo. Pac. Ry. Co., 184 Mo. App. 457, 462, 171 S. W. 44, 46, the Morrow and Aull cases were expressly distinguished, and it was held that where the bill of lading does require notice of claims resulting from delay, such notice must be given.

In the instant case Sec. H-14 requires "a full, complete and itemized written statement of all claims of any character . . . arising out of the contract." Considering the widespread and diverse operations of the State Highway Commission, we have no doubt that this comprehensive provision was intended to cover such "special" damages even more (if any difference) than those naturally flowing from a breach of the contract. [See 17 C. J., sec. 41, p. 715.] Sec. H-14 was recently upheld by Division 1 in Gillioz v. State Highway Commission, 348 Mo. 211, 153 S. W. (2d) 18, 21, where it was erroneously shown as "H-12." There is no rule of public policy restricting the right of the parties to contract for such notice. We rule this contention against respondent.

 Respondent's other contention is equally untenable. It is that the 60 days' notice on said two claims was waived because the Commission was cognizant of the changes in plan and of the fact that they would and did cause delay and additional work; also that when winter was coming on the Commission's engineers discussed with respondent the advisability of shutting down until spring. On this point cases are cited which hold railroads are not entitled to a notice of claim for damages when they are familiar with the facts and a notice would do no good. But in the present instance every change order issued by the Commission specified how the additional work was to be paid for, whether at contract prices, agreed prices, or on a force account basis; and all were indorsed by respondent or his representatives in this manner: "Receipt is acknowledged of this Change Order, and its terms of settlement are hereby agreed to." We do not see how the Commission can be held bound to have anticipated respondent's claims for damages, in view of his successive acceptance of and agreement to these change orders. The several orders, the purpose thereof, and the dates of the indorsements were as follows:

| Plff's Ex. C. No. | Purpose | Date of Indorsement |
|---|---|---|
| 1 | Blanket order, backfilling because of redesign | Oct. 24, 1936 |
| 2 | Blanket order, Special concrete protection | Nov. 9, 1936 |
| 3 | Backfilling, only 43.5% to be paid for | Nov. 20, 1936 |
| 4 | Construction of culvert and refabrication of steel left on hand | Apr. 8, 1937 |
| 5 | Special concrete protection | Apr. 17, 1937 |
| 6 | Lengthening other culverts (not involved herein) | Apr. 17, 1937 |

With reference to said claims asserted in counts 2 and 3 of the petition, respondent further contends the notice required by Sec. H-14 was waived because of the following facts. On June 2, 1937, respondent wrote the project engineer complaining of the retention of the $1500 liquidated damages (this was a different thing from the claims in counts 2 and 3). On August 9 the Chief Engineer replied by letter offering to recommend to the Commission that respondent be credited with additional time between certain designated dates, during which five different specified operations had been carried on, such as backfilling, heating concrete, etc. The letter stated this would extend the completion date to April 12, 1937 (instead of January 28 as previously allowed) and reduce the liquidated damages from $1500 to $585, a difference of $915. A blank Release of Claims was enclosed, and the letter requested respondent "if this proposed settlement meets with your approval" to sign and return the release and the recommendation would be made. The release form recited the filing by respondent of a claim for refund of the liquidated damages; and that the claim had been investigated and a conclusion reached to recommend the above refund. Appended thereto was a recital that in consideration of the payment of the $1500 the respondent released the Commission "from all claims of any kind or character whatsoever" arising out of the contract.

Respondent asserts this was not only a recognition of the claim for the $1500 refund; but also a waiver of the right to notice of the claims sued on in the second and third counts of the petition, for damages and material used in heating concrete, as mentioned in the second preceding paragraph. This is urged on the theory that the letter admitted the designated operations on which those claims were based had been carried on between the specified dates. Respondent says the letter was "an absolute admission of liability in a certain amount not conditioned upon a settlement being effected;" and also asserts it "was written at a time when no negotiations for settlement were under consideration and was not made with the express reservation of privilege," citing Jacobs v. Danciger, 344 Mo. 1042, 1050-1, 130 S. W. (2d) 588, 592(6), and other cases.

We cannot agree to any of this. The Chief Engineer's letter was written in answer to respondent's letter and offered as a "proposed settlement" to recommend the refund, contingent on respondent's approval thereof. And granting it admitted respondent had in fact done certain kinds of work between designated dates, it did not admit the work had been reasonably and timely prosecuted or recognize any claim for compensation or damages under counts 2 and 3. Apparently the respondent at that time was only asking for the release of the $1500. There never has been any dispute ▮▮ about the fact the respondent was engaged on the project clear up to May 28, 1937.

130

Another contention urged in the same connection is that when an admission of fact is made in an effort to compromise one claim it may be proven with respect to some other claim not involved in the compromise, citing Huttig v. Brennan, 328 Mo. 471, 492, 41 S. W. (2d) 1054, 1063(14). This rule is invoked on the theory that the Chief Engineer's letter dealt only with respondent's first claim, for refund of the $1500, and therefore any admissions therein could be shown on the claims asserted in the second and third counts of the petition, which were not then under consideration. · Everything else aside, we think the rule is not applicable because, as already stated, the letter made no admissions of disputed facts. So we adhere to our conclusion previously stated, that the claims in the second and third counts of the petition were barred for want of notice under Sec. H-14 of the Specifications.

There still remains the question whether the cause of action asserted in the first count of respondent's petition must fail because he failed to prove the Chief Engineer had certified the amount sued for was due and that the work had been satisfactorily completed, as required by Sec. E-1 of the Specifications. That section is very broad and makes the Commission's Chief Engineer the final arbiter of practically every conceivable factual dispute, including "any and all questions which may arise concerning .´ . . the manner of performance and rate of progress of the work." He must determine all such questions and his decision and estimate is conclusive, binding both parties. The estimate "in case any question arises, is a condition precedent to the right of the Contractor to receive any money due under the contract."

This section cannot be interpreted so broadly as to deprive the contract of mutuality. If it does not bind one party it cannot bind the other. There must be some valuable consideration moving from the Commission to the contractor. [13 C. J., sec. 179, p. 331; 17 C. J. S., sec. 100a, p. 444; 12 Am. Jur., sec. 13, p. 509, sec. 114, p. 608.] Yet it is also well established that a contract will not be devoid of mutuality merely because it leaves to one of the parties the option to fix and alter details. [13 C. J., sec. 185, p. 337; 17 C. J. S., sec. 100f, p. 451.] The test is whether it confers the right to exercise the option arbitrarily. [United Construction Co. v. St. Louis, supra, 334 Mo. l. c. 1023(6), 69 S. W. (2d) l. c. 647(9).] The right to change the plans of a construction contract is not arbitrary when proper provision is correspondingly made for adequate changes in compensation. But the question before us now is not so much that as it is whether the Chief Engineer arbitrarily refused to issue the estimate and certificate required by Sec. E-1, supra. There is no pleading or proof of it, and respondent must fail on that ground, also, though we do not mean to say he is foreclosed from making a proper showing on that point if the case is retried; or that the Chief Engineer can

pass decisively on questions of law. [Gillioz v. State Highway Commission, supra, 348 Mo. 211, 153 S. W. (2d) l. c. 22.]

 Finally the Commission assigns error in the admission and exclusion of evidence. One insistence is that Chief Engineer's letter of August 9, 1937, should have been excluded because it was an offer of compromise. If that were all it would have shown it would have been inadmissible. But it also showed entertainment of respondent's claim under the first count of his petition, and therefore was competent to prove waiver of notice of that claim. The Commission further argues the Chief Engineer had no authority to waive the requirements of Sec. H-14 of the Specifications for the giving of detailed written notice of claims; and says if he did that it would be a deviation from the terms of the contract (of which the Specifications were a part) and therefore violative of Sec. 8764, of our Statutes, supra. On that point he cites C. & O. Ry. Co. v. Martin, 283 U. S. 209, 75 L. Ed. 983, 51 Sup. Ct. 453, where it was held a railroad station agent has no power to waive a provision in a bill of lading requiring that claims for damages be filed within a specified time. But that ruling was under a federal statute enacted to prevent discrimination in railroad rates and service.

We cannot see that there is any discrimination in holding the notice under Sec. H-14 of the Specifications of the Highway Commission may be waived, if the rule is applied to *all* contractors alike. All would know it when they bid. Sec. E-1 of the Specifications makes the Chief Engineer final administrative authority on the *interpretation* of the Specifications. We think he would have the right in writing to accept a letter from a contractor as notice of his claim. But we do not say such authority would reside in his subordinates, the question dealt with in the Gillioz case, supra, 348 Mo. 211, 153 S. W. (2d) l. c. 21.

 The Commission offered testimony to prove that it had granted respondent two time extensions under Sec. I-7 of the Specifications. The first was because its Notice to Proceed was issued four days late. For this reason the date of completion was extended from December 1 to December 7, 1936, under certain "weighted time tables." Later, to compensate for the change in plans involving additional work the completion time was again extended to January 28, 1937, under the same tables. These weighted tables were on file in the Commission's office and open to public inspection of contractors and interested parties. They were based on the Commission's experience with highway construction over a 10 year period from 1926 to 1935, and showed weighted units, or, as we understand, average percentages of a year's work done on each calendar day of a year on various classes of work, thus allowing for average seasonal changes and weather conditions.

When the above testimony and the appropriate table were tendered, and again when the Commission made an offer of proof, respondent's counsel objected on the ground that the mere reference to the weighted

tables in the contract documents did not make them a part of the contract; that no copy thereof was given to respondent, and there was no proof that he knew of them. We are unable to see any merit in this objection. The table, though a separate document, could be incorporated in the construction contract by reference, 12 Am. Jur., sec. 245, p. 781; 13 C. J., sec. 126, p. 304, sec. 588, p. 530; 17 C. J. S., sec. 58, p. 408, sec. 299, p. 716. Clause 13 of respondent's Proposal or bid agreed "to complete the work within the specified number of weighted time units;" and Clause 14 declared that if changes in the plans for the work required more time for its completion, "a reasonable extension of time based upon the weighted time units will be allowed." Sec. I-7 of the Specifications stated that if extra or additional work was ordered by the engineer, an extension of contract time would be allowed based upon the weighted time tables. The same section in another place recited that the tables were on file in the offices of the Commission. Undoubtedly the table used was a part of the contract and admissible as such, and also to show respondent had not completed the project in the contract time.

Other testimony offered by the Commission was excluded. It was not permitted to prove why it changed the design of the culvert, and that it was because the respondent had unskillfully excavated the whole area within which the bridge footings were to be set, instead of a separate trench for each, thereby weakening the natural foundation for the culvert and making refilling and a slab base necessary. Also efforts were made to prove the respondent's machinery was insufficient and broke down, and that his foreman was drunk and did not prosecute the work. Evidence of this kind was competent. It was respondent's contention that the change in the culvert design was arbitrary and capricious, and that the delay to May 28, 1937, was wholly caused by that change coupled with an unusually early and severe winter. This tendered an issue for the jury. Surely the Commission should have been allowed to show the contrary.

The judgment is reversed and the cause remanded. All concur.