K. L. SAGER, K. J. SAGER, H. H. LEWIS, Comprising all of the last Board of Directors of the INLAND CONSTRUCTION COMPANY, a Defunct Missouri Corporation, v. STATE HIGHWAY COMMISSION OF MISSOURI, Appellant.—160 S. W. (2d) 757.

Division One, April 16, 1942.

*Louis V. Stigall* and *Wilkie Cunnyngham* for appellant.

*E. McD. Stevens, James T. Blair* and *Bradshaw & Fields* for respondents.

HYDE, C.—This is an action (by the last Board of Directors of the Inland Construction Company, a defunct Missouri corporation, hereinafter called plaintiff) for additional compensation claimed for extra work, due to change of plans made and additional difficulties encountered, during the construction of a state highway between Morehouse and Lilbourn in New Madrid County. The suit was in 14 counts and the jury found for plaintiff in some amount (on several for less than claimed) on each count, except the sixth. Judg-

ment thereon for the total amount of $4481.94 was entered, and defendant has appealed.

Defendant raised questions (in its answer) involving the construction of Section 48, Art. IV of the Constitution. [See Spitcaufsky v. State Highway Commission, No. 36838, 349 Mo. 117, 159 S. W. (2d) 647, recently decided in Division 2.] This highway was built in 1934 and 1935. It covered about seven miles, let in two projects. The 13 counts upon which plaintiff had a verdict (there was no appeal as to the sixth) involved several types of claims which may be classified, as follows:

Counts 1-4-5. That land furnished for borrow pits or for obtaining material for building the highway was not suitable because full of stumps, and that this delayed the work, damaged machinery and required use of teams and scrapers instead of excavating machinery, which increased expense of plaintiff.

Counts 2-3-7. That plans were materially altered by raising the grade or increasing the width of the highway at certain places without furnishing a sufficient borrow pit requiring plaintiff to widen side ditches (2), or to deepen existing borrow pit (3), and move wet material (3 and 7), which could not be done with excavating machinery, so that plaintiff had to use teams and scrapers at increased expense and delay.

Count 8. That plans as furnished were not correct as to working conditions because excavation, over the specified 200 feet, could not be done with excavating machinery at this place but required excavation at a considerable distance and removal to the highway which caused increased expense and delay.

Counts 9-10-11-12-13-14. That plans were materially altered by changing the grade and width at approaches to the highway, or over drainage pipes which were raised, requiring moving men and machinery back from other places, delaying the work and increasing expense.

Defendant's answer, in addition to general denial, set up Section 48, Art. IV of the Constitution as prohibiting payment of plaintiff's claims because the work authorized was fully covered by a written contract, let after notice and competitive bidding as required by Sections 3349 and 8764, R. S. 1939. (Sections 2962 and 8116, Mo. Stat. Ann. 1827 and 6900.) It stated that no payment could be made to plaintiff out of state funds for changes or extra work except in accordance with the contract which provided there should be no payment therefor unless there was a change order signed by the engineer or the parties before such work was done. Defendant also set up other contract provisions hereinafter stated. Plaintiff's reply claimed estoppel on the ground that defendant's engineer in charge of the work ordered the changes and promised to furnish the necessary change orders. Plaintiff alleged that it did the work relying on such representations.

■ Section 48, Article IV, provides: "The General Assembly shall have no power (to grant, or to authorize any county or municipal authority to grant any extra compensation, fee or allowance to a public officer, agent, servant or contractor, after service has been rendered or a contract has been entered into and performed in whole or in part), (nor pay nor authorize the payment of any claim hereafter created against the State, or any county or municipality of the State, under any agreement or contract made without express authority of law); and all such unauthorized agreements or contracts shall be null and void." (Parentheses ours.)

This court held, in the Spitcaufsky case, that the first clause of Section 48 prohibits the Highway Commission from paying extra compensation to a contractor outside the terms of a legal contract; that is, compensation for doing work, for which the legal contract does not provide, or for any claims different from those any other bidder at the letting could have legally asserted in the same circumstances if the contract had been awarded to him. The second clause forbids payment of a claim under an illegal contract, meaning in this case any contract not made as prescribed by Section 8764, supra; that is, the agreement to pay, relied upon, must be a part of the contract offered to the lowest responsible bidder by the notice and cannot be based upon substantially different oral understandings which are more beneficial to the contractor than the provisions included in and contemplated by the plans and specifications upon which bids were invited. [See also United Construction Co. v. St. Louis, 334 Mo. 1006, 69 S. W. (2d) 639.] We think this construction is sound and reaffirm it.

■ As pointed out in plaintiff's statement, the plans provided for what is commonly known as "typical section" construction over much of the project; that is, a typical cross section of the road, showing the contour of the surface of the road, the shoulders, ditches and back slopes, and the relative elevation of each to the others. There are two ways to build a highway; one is by an established grade designated on the plans; the other is by a typical section without any elevated grade. In typical section construction, the height of the roadbed is determined by the depth and width of the ditches as shown on the plans. This method of constructing a highway is by removing the dirt from the ditches and placing it on the roadbed, and is commonly known as "machine grading." This machine grading is ordinarily done with a 12-foot grader and a fifty or sixty-horsepower tractor, and with that equipment the contractor ordinarily employs ■ three 3-horse teams to drift the dirt back and forth across the road as it comes off of the machine grader. The elevating machine graders, used on this job, were equipped to roll on four wheels, had a disk plow of approximately thirty inches in diameter, and were equipped with a carrier to carry the dirt from underneath the machine out to

the side about eight or ten feet on a belt, depositing the dirt about twenty feet from the plow in dump trucks or wagons.

As to counts 1-4-5, there is no claim of change of plans by alteration of grade or width. Instead, it is claimed that there were hidden stumps, roots and logs in the material to be moved to build the highway. Removal of these things is claimed to be extra work, not covered by the contract, because the plans and specifications did not disclose the presence of such things in the material. It is claimed that this extra work constituted a material change therein, which resulted in altering the nature of the work so as to increase cost, and that additional compensation was promised by the project engineer. The contract provided (B-5) that "bidders are required to examine the site of the proposed work, the proposal, plans, etc. . . . for the work contemplated." Plaintiff's proposal stated that he had done so and plaintiff's president testified that they did go over the site of the work. The contract also provided (J-2) that the compensation provided by it should be full payment "for all loss or damage arising out of the nature of the work, or from the action of the elements; also for all expenses incurred by, . . . or from any unforeseen difficulties or obstructions which may arise or be encountered during the prosecution of the work, and also for all risks of every kind connected with the prosecution of the work until its final acceptance by the engineer." There was also a provision of the contract specifications (1-3) that "all stumps and roots in borrow pits shall be removed and disposed of without damage to adjacent property." Although it was stated that assistant engineers should "represent the Chief Engineer," the contract further provided (E-5) that "the assistants and representatives of the Chief Engineer shall not be authorized to revoke, alter, enlarge, relax or release any requirements of the special provisions, specifications, or contract, nor to issue instructions contrary to the plans and specifications;" that "the contractor may appeal from their decisions to the Chief Engineer;" that "all transactions between the contractor and the representatives of the Chief Engineer, which involve payments, shall be made in writing;" that "neither party to this contract shall take advantage of any transaction between the contractor and the representatives of the Chief Engineer;" and that "objections must be made in writing at the time of the transaction and directed to the other party." The plans showed the location of the borrow pits and the drainage ditch waste bank where material was to be obtained for building the highway. There was nothing in the contract to warrant unknown underground conditions, or that there were no buried roots, logs or stumps, but, on the contrary, it was left to the bidder to satisfy himself as to such conditions and it was specifically provided that the agreed compensation should be in full for the work regardless of such "unforeseen difficulties of obstructions." The most that the evidence·

shows is only an oral promise by assistant engineers (the evidence of this is very indefinite) to obtain payment for extra expense of plaintiff caused by such difficulties unforeseen by anyone. We hold that the contract provisions bar recovery on these counts; that these provisions were in accord with the above mentioned constitutional provisions; and that to enforce any such claimed oral promises of one of defendant's assistant engineers for such additional payments outside of and contrary to the contract would violate these constitutional provisions.

Likewise, count 8 did not involve any change in plans by alteration of grade or width to be built. The testimony was that over 200 feet (stations 625 and 627) shown as machine grading construction, the work ''couldn't be done with machinery and had to be done with hand labor, teams and fresnos.'' It was stated that ''this was because in that 200 feet a big ditch went across the road, and the road (the old road already there) got higher and went upon a spoil bank and that short distance couldn't be done with a machine, too much dirt had to be drifted to fill up this ditch . . . dirt hauled in to points on the road at an average haul of probably 75 to 100 feet.'' This part of the highway was built alongside an existing drainage ditch and dirt was to be taken from the waste bank of this ditch. This claim was all for additional labor cost. Of course this condition was something that was obvious and ▇ could have been seen upon examination of the site.

Plaintiff's proposal also contained the following provisions: ''The undersigned . . . will do all the work and furnish all the materials specified in the contract, in the manner and time therein prescribed, and in accordance to the requirements of the Engineer as therein set forth; and that he will accept in full payment therefor the amount of the grand total of the actual quantities as finally determined, multiplied by the unit prices bid in the attached schedule. . . . It is understood by the undersigned that the quantities given in the following schedule are a fair and close approximation of the amount of work to be done.'' The contract (B-4; D-3; J) contained these same provisions as to estimates and basis of payment. Certainly, under the circumstances shown and the provisions of the contract noted, plaintiff was not entitled to any more than the unit prices (for borrow excavation) for the amount of material moved. So far as the record shows, he has been paid for his work on that basis. The contract (E-1) authorized the engineer to ''determine the amount, quantity, character, classification, and quality of the several kinds of work performed,'' and made his ''decision and estimate'' thereon ''a condition precedent to the right of the contractor to receive any money due under the contract.'' His ''explanations concerning the plans'' and ''directions necessary to complete or make definite the plans'' were made ''final and binding on both parties.'' Such provisions

are upheld and enforced in the absence of any showing of fraudulent or arbitrary action or obvious mistake. [United Construction Co. v. City of St. Louis, 334 Mo. 1006, 69 S. W. (2d) 639; Myers v. Union Electric L. & P. Co., 334 Mo. 622, 66 S. W. (2d) 565; and Williams v. Chicago, S. F. & C. R. Co., 112 Mo. 463, 20 S. W. 631, 34 Am. St. Rep. 403.] We, therefore, hold that the contract bars recovery on count 8 and that no claim can be based upon the oral promise of defendant's assistant engineers for additional compensation because of the contract and because of the constitutional provisions.

 In all other counts (2-3-7 and 9 to 14 inclusive), it was alleged that there was a change of plans either raising the grade or increasing the width of the highway so as to require extra work on the highway or its approaches. The contract (D-3) provided that "the right is reserved by the Engineer to increase or diminish the total amount of work originally contemplated including the elimination of any one or more of the items; . . . " and that "should such increase or decrease in the quantity of work to be performed not exceed in value 25% of the bid price, the contractor shall accept payment in full at the contract unit prices for the actual quantities of work done." This section of the contract also authorized the engineer to "make alterations in the plans or the nature of the work," which did not "materially change the general features of the original plans." (Material changes were defined to be "those changes made necessary by the exigencies of the work resulting in the alteration of costs to the contractor by an amount which could not have been foreseen or estimated at the time of his bidding on the work.") Plaintiff stresses this provision as authorizing a departure from contract unit prices. However, we construe this to mean something more than a mere "increase or decrease in the quantity of work to be performed." In other words, an actual change of "the general features of the original plans" and not a mere increase in grade or width (less than the 25 per cent limitation) requiring only more excavation. (At unit price for borrow.)

The highway was built in flat country near the Mississippi River. The level of underground water was not far below the surface. There was often much surface water from heavy rains during the winter and spring. Plaintiff discontinued grading work entirely during the winter and because of some excessive rainfall in the spring was given additional time to complete the work, which made it possible for plaintiff to avoid the penalty of liquidated damages for which the contract provided. Because of flood conditions developing after the plans were prepared, the grade of a section of the highway was raised 1.5 feet. Counts 2 and 3 are claims for this extra work. Count 2 alleged that it was necessary to get part of the material by widening side ditches which required the use of teams and scrapers instead of excavating machinery. Count 3 also stated that a borrow pit furnished

had to be deepened to get the material for raising part of the grade, requiring the moving of wet earth by teams and scrapers.

The contract (E-7) provided that: "All changes in the work or departures from the plans provided for in the contract, except those due to reclassification of excavation materials, will be considered unauthorized and done at the expense of the Contractor, unless, before proceeding with the work, he has a copy of an Order Record (Form 259) signed by the Engineer, or a Change Order (Form C-238) signed by all parties whose signatures are provided for, except the Federal Engineer, and which shall contain complete detailed instructions regarding the proposed changes." A change order dated March 21, 1935, was issued to cover this work signed by the project engineer and the division engineer. It was also signed "Inland Construction Company, by F. M. Rochester." It provided that cost of the change was to be made "as per the contract unit price." This unit price was 23 cents per cubic yard of excavation. (For borrow excavation.) The total amount claimed would amount to 80 cents per cubic yard for this part of the work. Plaintiff claimed that Mr. Rochester did not have authority to make the agreement shown in the change order. However, plaintiff's president admitted that this change order was sent to him in a letter dated April 22, 1935, and that he "made no objection to Mr. Rochester's having signed the company's name on the change order." He also said "the excavation referred to in the change order was done along about July or August or two months or so after the change order was issued." In this situation we think it is clear that any estoppel on the claims in counts 2 and 3 would be the other way; against plaintiff instead of against defendant. Furthermore, the provisions of the contract concerning increase in quantity of work not exceeding in value 25 per cent of the bid price would seem to have made the unit price applicable so far as anything shown in the evidence is concerned. (At least after eliminating counts 1-4-5-8, which did not claim change of grade or width.) [See Spitcaufsky v. State Highway Commission, supra.] We hold that plaintiff was not entitled to recover on counts 2 and 3.

As to count 7, it was not alleged that there was any change of grade but the evidence took a broader range and plaintiff's testimony was that the grade was raised over this part of the highway. Part of the plaintiff's complaint here was that the side ditches after being constructed in accordance with the plan, failed to drain. Plaintiff claimed that it had to build tail ditches in order to help the situation and that even then it was necessary to operate with horses and scrapers in mud and water to get the dirt out. It would seem that the provisions of the contract hereinabove stated, concerning compensation for loss or damage arising out of the nature of the work, action of the elements, or unforeseen difficulties should cover this situation, and also that alleged in count 3.

■ However, plaintiff's president said: "We were told to go ahead and build the road and that a change order would be forthcoming. We built the road in reliance on that but never got the change order." Such an assurance, claimed to have been given by one of the assistant engineers (there were two) assigned to the project, and not by the chief engineer, was also claimed as to counts 9 to 14 inclusive. (These were for amounts ranging from $43.85 to $174.78, except the 14th, concerning culvert pipes under the highway, on which the jury allowed $310.14.) These were all for changing grade or width at approaches to the highway (count 9 was for an additional approach) because drainage pipes, which were too low to drain, were required to be raised. As to these, plaintiff's president testified: "Before we performed each of the additional pieces of work, I informed the Engineer that we did it believing that it wasn't in the contract, and in each instance we notified him that we would do it if we were paid on force account basis. He told us to go ahead and do the work and that they would issue change orders for this extra work." Plaintiff's president was only present on the project on the average of 2 or 3 days a week. His testimony is not very definite as to who requested change orders, to whom such requests were made, and what kind of change orders were requested. He said: "I don't remember any discussion with the Engineer about 'change orders,' but it is customary in this type of work to get 'change orders' for extra work." He also testified: "Q. What did he say about force account and the payments? A. It was uncertain; at least there wasn't any agreed price, and in the absence of an agreed price we go on a 'force account' basis." Plaintiff's superintendent testified: "I never requested a written order, I done it (extra work) ■ as quick as I could and as near like he wanted it as I could. . . . . I didn't ask for written orders for all of this stuff as we went along; I don't think he will say that. . . . He said: 'You have got to go ahead and do it; I don't know myself what we will do about this.' " Plaintiff's president did, however, say that he told the engineers that "we would have to be paid on force account basis." His claims in all counts are presented on that theory, which is cost plus a definite per cent for different classes of costs.

The force account provision of the contract (D-4) was as follows: "The Contractor shall, when directed by the Engineer, perform extra work for which there is no quantity and price included in the contract; or as provided in Section D-3 of these specifications (25% increase provision); or where necessary to fully complete the work contemplated. Extra work shall be done in accordance with the specifications. Payment for extra work will be based upon unit prices previously agreed upon in writing by the parties to the contract, or where such prices cannot be agreed upon, the work shall be done upon a force account basis, if so ordered by the Engineer."

One trouble with this theory is that, under this provision, the force account applies only to such extra work "for which there is no quantity and price included in the contract" and even then, only when unit prices cannot be agreed upon in advance, upon order of the engineer. Here, there were contract unit prices for this excavation at least according to the determination by the Engineer under the provisions of E-1, E-7 and J-2-3. [See Spitcaufsky v. State Highway Commission, supra.] Plaintiff's claims are in conflict with too many provisions of the contract. Moreover, plaintiff's evidence does not show any definite agreement about change orders and what provisions should be contained therein. Certainly it does not show that the engineers agreed to set aside the unit price provisions of the contract. Plaintiff claimed that it was the custom and practice (and had testimony to that effect) for work to be ordered and done before change orders were issued. Plaintiff, to prove this custom, also relies on the fact that two change orders were made after this work was all completed. However, these clearly show that they were for adjustment of actual work, which was mainly overrun of previous estimates, for the purpose of making final settlement. The contract required this to be done by some method. Furthermore, this contract could only be made in accordance with the authority granted by the Legislature and the assistant engineers had no authority to vary its terms. [Sandy Hites Company v. State Highway Commission, 347 Mo. 954, 149 S. W. (2d) 828.] While the contract defined the term engineer as "The Chief Engineer" or "his representative *whose authority is limited by the specific duties entrusted to him.*" This limitation (italicized by us) and those stated in E-5 hereinabove set out definitely prohibited these assistants from making a valid oral agreement different from the provisions of the written contract.

It is not claimed that plaintiff did not get full payment, for all earth excavated at the unit prices for which the contract provided. The Engineer had authority to make change orders providing for additional work to be paid for at the contract unit prices and plaintiff had agreed to do such work on that basis within the 25 per cent limitation. Plaintiff now attempts to obtain payment upon a different basis on an oral agreement by assistant engineers (about which the evidence is very indefinite and uncertain) to set aside the applicable provisions of the contract. Therefore, this is not a case of mere irregular or defective exercise of authority possessed, but is a case of no authority whatever for such assistants to change the terms of the written contract by oral agreements. [See Campbell Building Co. v. State Road Commission (Utah), 70 Pac. (2d) 857, l. c. 864.] To permit this to be done would be to sanction the violation of the statutory and constitutional provisions to which we have hereinabove referred; and since the assistant engineers had no authority to make such a contract, it cannot be enforced by estoppel. This Court en

Banc has recently held, in the case of a State officer at the head of a department, that the State (even though receiving a benefit from performance) ''cannot by estoppel become bound by the unauthorized contracts of its officers,'' because ''all persons dealing with such officers are charged with knowledge of the extent of their authority and are bound, at their peril, to ascertain whether the contemplated contract is within the power conferred.'' [Aetna Insurance Co. v. O'Malley, 343 Mo. 1232, 124 S. W. (2d) 1164; See Hillside Securities Co. v. Minter, 300 Mo. 380, 254 S. W. 188; State ex rel. Abeille Fire Ins. Co. v. Sevier, 335 Mo. 269, 73 S. W. (2d) 361; Scott v. St. Louis County, 341 Mo. 1084, 111 S. W. (2d) 186; see also Carter-Waters Corp. v. Buchanan County (Mo.), 129 S. W. (2d) 914, and cases cited.] Surely this rule must be applied to an attempt by a party to a written contract to change its terms, by an oral agreement with assistant engineers, when it specifically provides that they have no such authority, and payment on such unauthorized agreements is prohibited by constitutional provisions. The provisions of this contract were too plain to leave any basis for estoppel as to the matters in controversy. We, therefore, hold that defendant was entitled to a directed verdict on all counts.

The judgment is reversed. *Bradley* and *Dalton, CC.,* concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur.