Melvin and Judy **MILLER**, Appellants,

v.

**MISSOURI DEPARTMENT OF TRANSPORTATION**, Missouri Highway and Transportation Commission, Charles and Mardella Mears, Respondents.

**No. WD 58055.**

Missouri Court of Appeals, Western District.

Nov. 21, 2000.

Mark G. Stingley, Kansas City, for appellants.

James M. Slone, Lee's Summit, Stephen J. Briggs, St. Joseph, for respondents.

Before EDWIN H. SMITH, Presiding Judge, ULRICH and ELLIS, Judges.

ELLIS, Judge.

Appellants Melvin Miller and Judy Miller appeal the trial court's grant of summary judgment in favor of Respondents the Missouri Department of Transportation ("MODOT"), Missouri Highway and Transportation Commission ("MHTC"), Charles Mears, and Mardelle Mears. On review of summary judgment granted in favor of the defendant, this Court views the record in the light most favorable to the plaintiff and accords the plaintiff all reasonable inferences that may be drawn from the evidence. *Heins Implement Co. v. Missouri Highway & Trans. Comm'n,* 859 S.W.2d 681, 693 (Mo. banc 1993). The facts, viewed in that light, are set forth below.

In the summer of 1998, MHTC owned a piece of real property located at 2nd and Garfield Street in Saint Joseph, Missouri ("the Garfield Street property") which MODOT had used as a maintenance yard for old 71 Highway. At that time, Kevin Keith served as MODOT's District Engineer in District 1, where the Garfield Street property is located. In August 1998, after determining that MODOT no longer needed the Garfield Street property, Keith decided that MODOT should sell that property.

Keith delegated the legwork involved in selling the property to John Cool, the building and grounds maintenance supervisor for District 1. Subsequently, Cool arranged for the property to be sold through Coldwell Banker Commercial General Properties ("Coldwell Banker").

On September 4, 1998, the Mears presented Coldwell Banker with a proposed contract offering to buy the Garfield Street property for the list price of $40,000, subject to a satisfactory EPA audit and a corner stake survey. The proposed contract was on a form that Mr. Mears had obtained from his place of employment. This was the first offer made by any prospective purchaser. The proposed contract provided for a closing date of October 23, 1998. At the instruction of Coldwell

Banker, Mr. Mears added the language, "This contract is subject to the approval of the Missouri Highway Commission," to his proposed contract. Mr. Mears also presented Coldwell Banker with an earnest money check for $1,000.

On September 8, 1998, Coldwell Banker took the Mears' proposal to Cool. On September 9, 1998, the Mears' document was signed by Keith and given back to Coldwell Banker.

Later on September 9, 1998, the Millers went to Coldwell Banker and offered to buy the Garfield Street property for $40,000. They signed a proposed contract on a Coldwell Banker form proposing to buy the property for $40,000 with no contingencies. They gave Coldwell Banker an earnest money check for $1,000. Coldwell Banker took the proposed contract and check to Cool. Cool went to Keith and suggested that they enter into the contract with the Millers as a back-up contract in case the Mears' deal failed to close. Keith agreed to accept a back-up contract with the Millers. He added language to the Millers' proposed contract specifying that it was subject to the approval of MHTC and included a "Back Up Contract Addendum." That addendum provided:

It is understood and agreed that this is a back up contract to a contract dated 9–9–98, with a closing date of October 23, 1998. If the First contract does not close on or by November 23, 1998, then this contract shall go into full force and effect. If the First contract closed on or before November 23, 1998, then this contract shall be null and void and the earnest deposit shall be returned to the buyer.

The Millers agreed to the back-up contract addendum, and Keith and the Millers executed the document.

On September 15, 1998, Cool told Coldwell Banker that MODOT intended to consider any and all offers submitted for the property prior to September 23, 1998. This information was conveyed to everyone

who had expressed an interest in the property.

On September 16, 1998, Cool notified Coldwell Banker that MODOT had changed its position and decided to honor the original Mears' contract proposal. He stated that any other contracts would be considered back-up contracts. The Miller's were informed of this change in plans. On September 17, 1998, the closing date on the Mears transaction was extended by amendment to November 23, 1998.

On September 22, 1998, the Millers informed MODOT that they would pay $50,000 for the property. On September 23, 1998, the Millers and Keith executed a new contract document reflecting a purchase price of $50,000. It contained the same "Back Up Contract Addendum" as their original contract document and stated that it was subject to the approval of MHTC.

On November 22 and 23, 1998, Mr. Miller called Coldwell Banker and Keith to find out the status of the Mears closing. These calls were not returned.

The Mears appeared to close on the Garfield Street property on November 23, 1998, but MODOT failed to show up. When the Mears called MODOT, they were informed that MODOT had not been able to obtain the deed in time. The Mears and MODOT agreed to extend the closing date until December 4, 1998, and executed an extension agreement on November 24, 1998.

On November 30, 1998, Mr. Miller went to the Coldwell Banker office and told them that he intended to purchase the Garfield Street property pursuant to the back-up contract. That same day, the Millers' attorney sent a letter to Keith informing him that the Millers were prepared to immediately close on the property pursuant to their back up contract.

On December 2, 1998, Thelma Kelley sent Keith an inter-office correspondence stating that MODOT's Chief Counsel's Office would not approve the Mears' contract. Kelley's correspondence indicated that a standard form from the Chief Counsel's Office had to be used for the sale of any MHTC property by an outside realtor.

Later on December 2, 1998, MODOT sent a new contract to the Mears on the MHTC standard form. The new contract was for the originally agreed sales price of $40,000. The Mears executed this contract and returned it to MODOT. Assistant District Engineer Donald Hillis executed this sales agreement on behalf of MODOT, signing Keith's name without his approval.

On December 8, 1998, the Millers' attorney sent a letter to Coldwell Banker indicating that the Millers still wanted to purchase the property. On December 14, 1998, Coldwell Banker answered that letter. Coldwell Banker stated that the Miller contract had a clause providing that it was subject to the approval of MHTC. Coldwell Banker stated that MHTC had indicated that it would not honor any contract that was not on the MHTC standard form. The letter went on to state, "So long as the first offerors agreed to purchase the property based on the terms in the Highway Commissions [sic] contract they were willing to proceed to close with that party. The State contract was offered to the first parties and they agreed to it and signed same and this has been forwarded to the main office in Jefferson City for further handling."

MODOT and MHTC transferred the Garfield Street property to the Mears on January 26, 1999, presumably pursuant to the MHTC standard form contract signed on December 2, 1998.

Prior to that closing, on January 11, 1999, the Millers filed suit against MODOT, MHTC, and the Mears. Count I of their petition sought specific performance of the second contract between MODOT and the Millers. In Count II, the Millers asserted a claim for declaratory relief against the Mears asking the court to declare the transfer of the Garfield Street property to the Mears void. Finally,

Count III of the petition asserted a claim for damages from MODOT and MHTC for breach of contract.

On November 22, 1999, the Circuit Court entered summary judgment against the Miller's on all three counts of their petition. The Millers challenge that judgment on appeal.

■■■ Our review of the trial court's grant of summary judgment is essentially *de novo,* and the issue of whether the trial court properly granted summary judgment is an issue of law. *Graves v. Berkowitz,* 15 S.W.3d 59, 61 (Mo.App. W.D.2000). "As the trial court's judgment is founded on the record submitted and the law, [this Court] need not defer to the trial court's order granting summary judgment." *Kruse Concepts, Inc. v. Shelter Mut. Ins.,* 16 S.W.3d 734, 737 (Mo.App. E.D.2000). On review of summary judgment granted in favor of the defendant, this Court views the record in the light most favorable to the plaintiff and accords the plaintiff all reasonable inferences that may be drawn from the evidence. *Heins Implement Co.,* 859 S.W.2d at 693. "Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits filed in connection with the motion, demonstrate that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Id.*

On appeal, the Millers offer alternative arguments, the applicability of which depends upon whether the various contracts are deemed to be valid. Therefore, in addressing this appeal, we must first determine which, if any, of the four contracts for the Garfield Street property were valid.

■■■ "Before a state officer can enter into a valid contract he must be given that power either by the Constitution or by the statutes." *Aetna Ins. Co. v. O'Malley,* 343 Mo. 1232, 124 S.W.2d 1164, 1166 (banc 1938). "All persons dealing with such officers are charged with knowledge of the extent of their authority and are bound, at their peril, to ascertain whether the contemplated contract is within the power conferred." *Id.* "In order to enter into a valid contract, the [state official] must exercise his authority 'in manner and form as directed by the Legislature.' " *State ex rel. Stricker v. Hanson,* 858 S.W.2d 771, 775 (Mo.App. W.D.1993) (quoting *O'Malley,* 124 S.W.2d at 1166). A contract is void where the public agency fails to follow proper procedures and exceeds its statutory authority. *Id.* at 776.

■■■ Section 227.290 [1] grants the MHTC authority to sell property that it no longer needs. That section provides:

> Whenever in the opinion of the state highways and transportation commission the advantageous use of any interest in land or any leasehold which has heretofore or may hereafter be acquired by the commission has ceased, the state highways and transportation commission shall have authority to convey the same for the best available cash price by deed signed by its chairman or vice chairman and attested by its secretary.

§ 227.290.

MHTC, in turn, delegated limited authority to MODOT to institute sales of those properties no longer necessary to MODOT's operations. The MHTC "Delegation of Authority Execution of Documents Policy" issued June 5, 1998, states that the Commission has authorized the Chief Engineer of MODOT or his designee to execute documents affecting certain transactions without prior submission to the Commission and notes that the Chief Engineer, in turn, has made certain designations. Section 38(e)(4) of that policy indicates that the Chief Engineer had delegated authority to district engineers to authorize the sale of property appraised for $50,000 or less, provided that the

---

**1.** All statutory references are to RSMo (1994) unless otherwise indicated.

Chairman or Vice Chairman of the Commission executes the conveyance document. Section 38(e)(1) provides that District Engineers are authorized by the Chief Engineer to enter into Standard Form sales agreements with potential purchasers of excess property if the contract requires the purchaser to pay ten percent of the negotiated purchase price prior to Commission action on the sale.

With regard to the procedures and forms that must be utilized in the sale of property, the "Delegation of Authority Execution of Documents Policy" begins by stating:

> All documents executed on behalf of the Missouri Highway and Transportation Commission and referenced herein shall be approved as to form by the Chief Counsel or an authorized Assistant Counsel, signed by an authorized Commission representative, and attested to by the Secretary who shall affix the official seal of the Missouri Highway and Transportation Commission; however, the transactions designated "STANDARD FORM" may be executed by the authorized Commission representative without approval as to form, attestation, of affixing the seal.

As previously noted, Section 38(e)(1) authorizes district engineers to enter into standard form sales agreements with potential buyers of excess property. Section 5–4.5 of the MODOT Right of Way Manual directs district engineers to utilize the proper standard form in any contract for the sale of property over $5,000. That section states:

> The district shall use the Sales Agreement Form 5–4.5 on all disposals of $5,000 or more. When using the sales agreement, a 10% security deposit shall be collected at the signing of the agreement.... The sales agreement shall be signed by the district engineer.

Thus, Keith, as the district engineer for District #1, was only authorized by MHTC and MODOT's Chief Engineer to enter into contracts utilizing the specified sales agreement form and was not granted authority to enter into contracts utilizing other forms if the sales price was $5,000 or more.

In this case, none of the first three contract documents executed by Keith utilized the proper sales agreement form. Moreover, these contract documents did not require the requisite 10% security deposit, and a sufficient deposit was not obtained from either the Mears or the Millers upon the signing of these agreements. Accordingly, Keith failed to follow the proper procedure· and lacked authority to enter into any of the three proposed contracts on behalf of MODOT and MHTC, and therefore, these agreements were not valid or binding on MODOT or MHTC. *See Stricker,* 858 S.W.2d at 775.

 With regard to the fourth and final contractual document, while it was executed on the proper form, it was signed by Hillis, a MODOT employee who did not have any authority to execute such a document. Therefore, that document is also invalid. *See Sager v. State Highway Comm'n,* 349 Mo. 341, 160 S.W.2d 757, 763 (1942) (holding that assistant engineers had no authority to enter into an oral agreement to vary the terms of a written contract and that such an agreement could not be enforced by estoppel).

In sum, since Keith and Hillis failed to follow the proper procedures and exceeded their authority in signing the various contracts, none of the four contracts was valid. Since neither of the Miller contracts was valid, the trial court cannot be deemed to have erred in granting summary judgment on Counts I and III of the Millers' petition, both of which asserted breach of contract claims against MODOT and MHTC.

This does not, however, end our inquiry. Count II of the Millers' petition, on which the trial court also granted summary judgment, alleged that the sale of the Garfield Street property to the Mears was unlawful under § 227.290. Count II asked the trial court to enter an order declaring the sale

of the property to the Mears null and void and to further order the return of legal title of the property to MODOT and MHTC for conveyance to the Millers. This claim is not resolved by our determination that the various contracts were void.

On appeal, the Millers assert that the trial court erred in granting summary judgment in favor of the various defendants because MODOT violated § 227.290 by accepting an offer that was not the best cash price available for the property. The Millers claim that because MODOT violated § 227.290 the transaction between the Mears and MODOT must be considered void.

MODOT and the MHTC argue that they did not violate § 227.290 because the proper time to assess the best available cash offer was September 9, 1998, when Keith signed the first Mears' contract proposal for $40,000. MODOT and MHTC claim that the Mears obtained contractual and equitable rights to purchase the property at that point and that no better price was available at that time.

■■■ As noted, *supra*, Keith was not authorized to enter into the original contract with the Mears. " 'Public officers have and can exercise only such powers as are conferred on them by law, and a state is not bound by contracts made in its behalf by its officers or agents without previous authority conferred by statute or the constitution ...' " *O'Malley*, 124 S.W.2d at 1166 (quoting 59 C.J. *States* § 286 (1932)). A contract is void where the public agency fails to follow proper procedures and exceeds its statutory authority. *See Stricker*, 858 S.W.2d at 776. Accordingly, neither MODOT nor MHTC was contractually bound to sell the property to the Mears by virtue of Keith's execution of the Mears' first contract form.

■■■ Likewise, MODOT and MHTC were not bound under principles of equity to sell the property to the Mears for $40,-000. " '[A] state cannot by estoppel become bound by the unauthorized contracts of its officers; nor is a state bound by an implied contract made by a state officer where such officer had no authority to make an express one.' " *O'Malley*, 124 S.W.2d at 1167 (quoting 59 C.J. *States* § 286 (1932)); *See also Sager*, 160 S.W.2d at 763. While Keith may have felt an obligation to honor his word to the Mears, MODOT and MHTC did not share an obligation to honor that agreement. Accordingly, September 9, 1998, is not the proper date to utilize in determining whether MODOT and MHTC conveyed the property for the best available cash price.

■■■ As noted, *supra*, the Legislature extended authority to the MHTC to sell excess property for the best available cash price. § 227.290. At the time that the property was transferred to the Mears, the Millers were offering to pay $10,000 more than the Mears for the Garfield Street property. The uncontroverted evidence establishes that MODOT and MHTC were aware of the Millers' willingness to pay a higher price at the time the property was sold. Indeed, they had been aware of the Millers' higher offer since September 22, 1998. Furthermore, MODOT and MHTC were not bound under a valid contract to sell the property to the Mears at the time the Miller offer was originally extended. Accordingly, MODOT and MHTC did not sell the Garfield Street property for the best available cash price and exceeded the authority granted by § 227.290 in the transfer of the property.

■■■ Finally, the Mears assert that § 227.290 does not apply because there were never two different offers for the property existing at the same time. They claim that in order for an offer to exist, it must comply with the statute of frauds. This argument has no merit. The statute of frauds applies to enforcing and proving the existence of a contract and is not applicable in determining whether an offer exists. The existence of an offer can be established through testimony and its con-

tinued viability can be inferred from the evidence. *See Crabb v. Mid–American Dairymen, Inc.,* 735 S.W.2d 714, 715–16 (Mo. banc 1987). In this case, the evidence viewed in the light most favorable to the Millers sufficiently establishes that MODOT and MHTC were aware that the Millers were willing to pay $50,000 for the Garfield Street property from September 22, 1998, to the present day. There is no evidence that this offer was ever withdrawn. Therefore, at the time the property was conveyed, the $50,000 offer by the Millers was the best available cash price.

Because MODOT and MHTC violated § 227.290 in transferring the Garfield Street property to the Mears, and because the Mears were on notice that the transfer was being made over the objection of the highest bidder, the transfer of that property must be deemed void. Accordingly, the trial court's entry of summary judgment must be reversed as to Count II of the Miller's petition and the cause remanded to the circuit court for further proceedings consistent with this opinion.

All concur.